COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| GREAT AMERICAN INSURANCE COMPANY D/B/A GREAT AMERICAN INSURANCE COMPANIES, | § § § | No. 08-11-00302-CV |
| Appellants, | § | Appeal from the |
| v. | § | 48th District Court |
| GLEN HAMEL AND MARSHA HAMEL, | § | of Tarrant County, Texas |
| Appellees. | § | (TC# 48-215116-05) |

## **O P I N I O N**

In this insurance coverage and indemnity dispute, Appellants, Great American Insurance Company d/b/a Great American Insurance Companies (hereafter, "Great American")[1] appeal the trial court's judgment in favor of Glen and Marsha Hamel, Appellees.[2] In five issues, Great American alleges the trial court committed reversible error. We sustain Issue Five, modify the trial court's judgment, and affirm the judgment as modified.

### **BACKGROUND**

*Procedural History of the Construction Case*

---

[1] Appellants requested the trial court enter judgment against both Appellants in the coverage case, jointly and severally, if judgment was entered in favor of the Hamels and, consistent with the trial court's practice, we hereafter collectively refer to Appellants as "Great American."

[2] As this case was transferred from our sister court in Fort Worth, we decide it in accordance with the precedent of that court. TEX. R. APP. P. 41.3.

Great American issued policies to its insured, Terry Mitchell Builders, Inc. (TMB) covering policy periods May 3, 1996 to May 3, 1997 (first policy period), May 3, 1997 to May 3, 1998 (second policy period), May 3, 1998 to May 3, 1999 (third policy period), May 3, 1999 to May 3, 2000 (fourth policy period), and May 3, 2000 to May 3, 2001 (fifth policy period). The fourth and fifth policies contain an exclusion relating to exterior insulation and finish system (EIFS), which the policies describe as "synthetic stucco." The policies for the first three periods do not contain this exclusion.

TMB was hired to inspect and complete construction of a home in Flower Mound, Texas, for Glen and Marsha Hamel after the original contractor, GSM, purportedly abandoned the project. TMB utilized subcontractors and expressly agreed that it would finish the building and complete improvements in a good and workmanlike manner. It completed the Hamels' home in October 1995.

By August 2000, Glen Hamel began to observe baseboards warping and the staining of walls above the baseboards in the home. Glen attempted to determine the cause and eventually consulted with home inspectors who indicated that there was water penetration that was probably related to the roofing and fascia board areas.

In 2005, Glen and Marsha Hamel sued TMB for breach of implied warranty, negligence, violations of the Deceptive Trade Practices Act, and violations of the Residential Construction Liability Act relating to its failure to construct and inspect their home in a good and workmanlike manner (the construction case).[3] Great American refused to defend TMB in that case.

On or about May 19, 2005, the Hamels' counsel, Hunter T. McLean, sent a letter to TMB's

---

[3] *See Glen and Marsha Hamel v. Terry Mitchell Builder, Inc.*, Cause No. 2002-20076-158, 158th District Court, Denton County, Texas.

counsel, Robert Hudnall, to confirm the Hamels' position and agreement on a few matters that Hudnall had raised on behalf of TMB. The Hamels signed a letter wherein they agreed that their claims were against TMB and, in the event of a judgment against TMB, the Hamels would not attempt to enforce or collect the judgment against the assets of Terry Mitchell, individually, or against his other companies or business assets, and would not attempt to pierce the corporate veil of TMB. Based upon Mitchell's representation that TMB had not transferred assets in excess of $25,000, the Hamels further specified that they would not attempt to set aside, void, or invalidate any transfer of assets of TMB to other corporations or business interests of Mitchell. The agreement included a recitation that Terry Mitchell was permitted to continue to use his personal tools of the trade and that the Hamels would not seek to levy upon those assets, even if held in the name of TMB. The Hamels stated that they did not intend to pursue other assets of TMB and agreed not to assign any judgment against TMB or to publish or use the judgment to affect Mitchell's individual credit. In consideration of the Hamels' agreements, Mitchell executed the document on behalf of TMB as evidence of his agreement to appear at trial on May 26, 2005, and not seek a continuance.

On May 25, 2005, Mitchell, on behalf of TMB, executed stipulations of fact under cover of "Stipulations of Fact and Responses to Plaintiffs' First Request for Admissions to Terry Mitchell Builder, Inc." The stipulations primarily related to TMB's duties as a general contractor and supervisor to ensure that the Hamels' home was constructed and completed in a good and workmanlike manner without defects, and to ensure the home was properly inspected for construction defects. TMB stipulated that its failures were honest oversights.

The construction case was tried to the bench. At trial, Hamel testified that water had been

3

entering the house through an open eave area that permits water to flow directly into the ceiling system, and the trial evidence demonstrated that problems involving the roofing structure, including the existence of unfinished open areas, holes, the use of steel nails, missing and improperly installed frieze boards, improperly cut roof decking, and problems with roof valleys and drainage existed.

Terry Mitchell testified as president of TMB. Mitchell testified that as the general contractor on the Hamels' home, he had agreed that the home would be completed in a good and workmanlike manner, and admitted that he had a duty to perform a final inspection to ensure that the home was so completed without problems. Mitchell testified that he had been performing this type of work for 25 years, had tried to do his best, continued to have more work than he could complete, had constant referrals and no complaints. Agreeing he would never leave a project knowing there were problems, Mitchell explained that he does not do any of the work himself, hires third-party independent contractors, and admitted that his main role as a general contractor is to oversee and inspect the work of the subcontractors. Mitchell explained that he is "a little more hands-on kind of guy than an average general contractor," but admitted that "especially in this case[,] there were some things that were previously done and easy to miss."

Although Mitchell agreed that a house which is constructed with points of water entry could not be deemed completed in a good and workmanlike manner, he explained that "we noted some leaks and some things with the previous [work] and took care of it, like nail holes in the roof that somebody else roofed[,]" and did not intend to leave the house with holes and gaps where water could enter. Regarding his failure to determine that the roofing nails were not galvanized, Mitchell explained that this is "easy for an oversight" because the shingle covers the nail and the

4

only way to determine whether galvanized nails were used entails the removal of the roofing shingles. Mitchell admitted that he did not see the fascia board gap or anything detrimental during his final inspection, and agreed that if the roof deck was cut too short, it could not have been completed in a good and workmanlike manner. He also noted that "[s]ome of this could have been caught prior to now, and maintenance fooled with it, but a visual back then might not be the same ten years later." Mitchell agreed, however, that he did not crawl and inspect a window and roof ridge area, and admitted that because they were framed with a gap, they were not finished in a good and workmanlike condition. He also admitted that he did not notice during his final inspection a portion of the roof valley that shoots water at a wall and explained that if it was not waterproofed with flashing and is leaking, it was not constructed correctly. Mitchell explained that he had not water tested the flat roof but noted that he could not have inspected the kind of pan installed without pulling "strings" off to figure out what the previous people had done. Mitchell conceded that it is foreseeable that if gaps are left in the exterior envelope of a house, water may enter during a rain or other event. He also agreed that water can be very destructive to wood, sheetrock, and stud walls, and explained that it is "[p]robably one of the bigger problems that there [is]."

According to Mitchell, most of the problems he had been asked about, other than the shower, had been constructed by GSM as the project was 60 percent to 70 percent complete when he took over, and he did not see any of the problems about which he had been asked during direct examination. However, he agreed that if he had done a more thorough inspection, and had actually climbed up on the Hamels' roof, he may have found or identified some of the problems with the home.

Donald Yeandle, a general contractor since 1981, and who is also trained to inspect exterior insulation and finishing systems (EIFS), testified regarding his inspections of the Hamels' home, as well as the construction defects, water entry points, water damage to the studs and other components of the home, and wood rot he observed there.[4] Yeandle opined that TMB failed to complete the Hamels' residence in a good and workmanlike manner, and that TMB's failure to do so and to oversee and inspect the work of its subcontractors is responsible for the water entering the home. The trial court entered findings of fact and conclusions of law and, finding that TMB breached the duties it owed the Hamels and that its negligence was the producing and proximate cause of the Hamels' damages, and on July 1, 2005, entered judgment in favor of the Hamels, which included an award of $50,000 for mental anguish and distress.

*Procedural History of the Coverage Case*

In September 2005, after the Hamels obtained judgment against it, TMB assigned to the Hamels most of its claims against Great American. After Great American refused to pay the damages assessed against TMB in the construction case, the Hamels filed this suit against Great American (the coverage case) for breach of contract, declaratory relief, and Texas Insurance Code violations.[5] Like the construction case, the coverage case was tried to the bench, which also ruled in favor of the Hamels.

At the coverage trial, Don Yeandle again testified as an expert for the Hamels. Yeandle explained that he owns a construction business, and in 1985, began performing moisture-intrusion investigations and structural repairs to wet buildings. Approximately 20 to 30 percent of Yeandle's business involves building houses and remodeling as a general contractor, and the

---

[4] According to Yeandle, the "problems" with the Hamel home "are totally independent of the EIFS system."
[5] The trial court dismissed the Hamels' prompt-payment statutory cause of action under the Insurance Code after they abandoned it at trial.

6

remainder of his business involves conducting structural repairs for wood rot, old buildings whose members have failed, foundation structures, and buildings struck by vehicles. He explained that his company places a greater focus on water-intrusion work. Yeandle testified that he is a certified stucco inspector, has taken approximately fifteen to twenty two- to three-hour moisture intrusion and products classes through the Association of General Contractors, though he failed to list them, and deals with water intrusion behind stucco resulting in rot, including wood rot. Before it was sunsetted in 2000, Yeandle conducted everything from water intrusions to building defects, primarily on behalf of builders, in connection with the Texas Residential Construction Commission. During the eight to ten years preceding the coverage trial, Yeandle's work had focused on the investigation and repair of buildings having moisture intrusion. Much of Yeandle's work involved performing warranty service for builders. On a regular basis since 1985, Yeandle had worked on at least 100 projects, buildings, or structures suffering from wood rot. During twenty or thirty of those projects, most of which dealt with showers or areas where water was getting into a wall cavity, Yeandle had seen and learned of the wood rot rate of decay, including the time within which wood rots to an advanced stage when it is exposed to the proper moisture level and temperatures. Yeandle explained that wood rot is a fungus that grows and feeds on wood, and needs moisture of 22 percent or greater and favors temperatures between sixty-degrees and ninety-six degrees to colonize and survive. Yeandle has read articles, one of which states that the fungus can continue to grow slowly at a temperature as low as thirty-eight degrees.

Yeandle testified regarding his experience in examining other structures suffering water intrusion or exposure resulting in wood rot. He described several projects in which he was

involved, including a home that was completed in late 2005, and was found to be suffering advanced decay of many framing members by late 2009, and a three-year old multi-family development where he found 10-15 percent decay in the floor joists and 100 percent decay or wood rot in some of the other structures that were exposed to water. Yeandle recalled a project involving an eight- to nine-year-old home where severe decay was initially found and repaired, and where two to two and one-half years later he found advanced stages of decay of the studs and OSB sheathing near a water entry point that was not previously found during the earlier repair. On most warranty service calls, Yeandle is called out within two years of completion or substantial completion of a home. Yeandle has been called to two-year old homes where he has opened moist walls to find that the studs have decayed.

Yeandle opined that the amount of decay that would necessitate replacement of a wood member would be 10 percent loss of weight or mass. Yeandle agreed with this statement from an article on biodegradation of wood that referenced laboratory tests:

> In laboratory tests, losses in toughness ranged from six percent to less than 50 percent by the time a one percent weight loss had occurred in the wood as a result of fungal attack. By the time weight losses resulting from decay have reached 10 percent, most strength losses may be expected to exceed 50 percent. At such weight losses, decay is detectable only microscopically. It may be assumed that wood with visually discernable decay has been greatly reduced in all strength values.

According to Yeandle, this statement is consistent with his experience in discovering wood decay and its effects on the structural strength of wood in building structures. Having used an awl to test wood that appeared unaffected, Yeandle says he has found more decay than was visible, and explained that when there is a 1 percent weight loss, the wood has lost its ability to carry or transfer the requested load. He further explained, "[I]f we see the outward signs of fungus, it's already

8

starting to go into its advanced decay[, and] at that point, we will usually replace the member or call in a structural engineer to evaluate the member." Yeandle agreed with the research, literature, and structural engineers with whom he has worked that at 10 percent weight loss, which he deems "serious" decay, a wood member should be replaced.

Yeandle explained the methods he implements to test for wood rot. Because the wood is part of a building and cannot be weighed in a laboratory, field methods are utilized. Yeandle uses a wet-wall meter to determine the relative moisture content readings in a wall cavity. When a high moisture reading is obtained from the wet-wall meter, Yeandle then inserts two stainless steel probes into a framing member and measures the resistance of electrical current between the two probes.[6] A low resistance reading indicates there is more water between the probes. Ninety-five to 98 percent of the time after Yeandle has conducted the metered testing and later gains access for a visual inspection of the wood, the members which have shown "high moisture" readings are visually confirmed to have advanced wood rot. Yeandle considers the pin probe test to be a very accurate test or indicator of advanced wood rot.

Another probing method utilized to test for wood rot includes driving an awl into a wood member to check the toughness of the wood, and conducting a visual inspection. Yeandle testified that the use of a light hammer stroke on an awl against a member which requires a turn of the awl to extract it usually indicates the wood has good density. However, he explained that when an awl travels more than one-half inch into the wood and is easily removed, this is an indication that the wood has been compromised.

Yeandle testified that he has served as an expert witness approximately 100 times, and has been retained as an expert by Great American on fifteen or twenty occasions, typically regarding

_____

[6] Yeandle testified that infrared technology is also available for these purposes.

"structural failure." Yeandle's curriculum vitae and a non-comprehensive list of cases in which he has testified by deposition or at trial were admitted into evidence without objection.

On cross-examination, Yeandle admitted that he is not a microbiologist, scientist, or engineer, and noted that he has taken two continuing education courses regarding the biology of fungal growth and the prevention and remediation of mold problems, and observed that his experience is practical. In February 2002, Yeandle performed non-destructive tests of the Hamels' home, including a moisture scan of the envelope of the home using a wet-wall meter and pin probe readings of areas in which he suspected high moisture content. In his preliminary report regarding the Hamels' home, Yeandle included a non-exhaustive list of areas he tested and found to have high moisture content. Yeandle's pin probe tests "met no resistance" in certain areas when the sheathing was probed, and in at least fifteen areas of the Hamels' home he saw direct evidence of wood rot.

In a subsequent visit to the home in 2003, Yeandle opened a previously-opened patch in the shower area and found advanced decomposed wood. Yeandle testified that the wood had rotted completely, to the extent that he was able to remove the wood by scooping it with his hand. Yeandle estimated that particular member had suffered decay of 25 percent to 35 percent. Yeandle put the wood rot in a bag and gave it to the Hamels' prior counsel, Mr. Cox. In 2008, Yeandle repaired the Hamels' home, where he observed wood rot, including several members suffering 100 percent decay which could be removed easily by hand.

Yeandle agreed that "100 percent decay" means that across the cross-section of the area that suffered the wood rot, there is nothing remaining that has its original integrity or characteristics. He characterized that description as meaning that when a portion of the member

10

is deteriorated, it has failed, and opined that if any portion of the member has more than 10 percent decay, it must be examined to determine whether replacement is necessary. He further described advanced wood rot as "kind of black, [and having] loss of density, [and] more than 40 or 50 percent of the member [is] damaged." Yeandle agreed that as long as favorable environmental conditions exist, the wood rot fungus continues to progress until it has consumed the wood as a food source. Yeandle has personal experience in examining wood that has been exposed to water for less than six months and has observed that the fungus had not yet damaged wood to an extent that it needed to be replaced. He has also read articles stating that wood rot begins between six months and one year after wood first becomes wet.

In assessing the Hamels' home, Yeandle explained that he first attempts to determine the inception of the colonization of wood rot fungus and resulting decay. According to Yeandle, with one exception, all of the points of entry at the Hamels' home involved "wide-open holes" where water would enter "most likely every time it rained[.]"

In forming his opinions, Yeandle utilized National Weather Service data for North Texas, collected from Alliance Airport, which is six or seven miles from the Hamels' home, and National Climatic Data Service satellite information regarding rainfall throughout the North Texas area in conducting his analysis. Yeandle opined that although there may have been water infiltration from October 1995, the Hamels' move-in date, through April 1996, the winter temperatures were not favorable for fungus growth and noted, as stated in the biodegradation article, the wood rot fungus is essentially dormant at thirty-five degrees. He explained that the fungus begins to colonize within ten to fifteen days, but deterioration or softness of the wood typically results in a member in six months to a year.

11

He opined that the fungus in the Hamels' home most likely commenced growing in May 1996, because favorable temperatures and consistent rainfall existed in that month, which could support and expedite fungal growth and lead to rotting of wood framing members and sheathing. Where daytime temperatures reach sixty degrees but drop to thirty-two degrees during the evening, the fungus will not likely grow in that environment, but Yeandle explained that when evening temperatures are above fifty or sixty degrees and the daytime temperatures are above eighty degrees, conditions that are conducive to the fungus' growth exist. Because the fungus had not grown freely but, rather, in interrupted stages before May 1996, the fungus did not have the right conditions to move through the members. Therefore, Yeandle considered May 1996, to be the beginning point for the commencement of the wood rot decay. He noted that as the fungus grows in favorable conditions, "it increases the area of decay as the wood loses toughness and the area gets bigger," a greater area can absorb more water, the area continues to enlarge and "continue[s] to progress," with new damage suffered as more wood is consumed year by year.

Yeandle explained that when water enters a wall clad in EIFS, it is usually trapped, cannot easily escape, and provides an excellent environment for rapid fungal growth. However, according to Yeandle, none of the problems with the Hamels' residence that were addressed during the construction case had anything to do with the design, manufacture, construction, fabrication, preparation, installation, application, maintenance, or repair, including remodeling, service, correction, or replacement of an exterior insulation and finish system (EIFS) or any part thereof or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulkings, or sealants in connection with such a system.

Based on the intervening weather conditions, his study of articles, and personal experience, Yeandle stated that the average time period for the rot to progress, more likely than not, to a degree that resulting damage necessitates replacement of the wood is eighteen to twenty-four months, and noted that in an eighteen to twenty-four month period of favorable conditions, again more likely than not, wood rot will have progressed into its advanced stages of decay.

On these bases, and using the universally-accepted 10 percent threshold as a basis for replacement, Yeandle stated that he was not confident that the wood rot had "gotten that far" between 1996 and 1997, but he was 90 percent certain of his opinion that some degree of wood rot with actual physical damage to the framing member occurred from May 1996 to May 1997, during the first Great American policy period, because all favorable elements were in place. Agreeing that October 1997, which occurred within the second Great American policy period and eighteen to twenty-four months after May 1996, and based on his personal observations of the Hamels' home, the state of decay when conducting tests, his personal experience, and reference to wood rot articles, Yeandle opined that more likely than not, the members in the Hamels' home had deteriorated beyond 10 percent, thus necessitating replacement, and he was 70 percent certain that his opinion regarding the decay occurring this period is probably correct. Yeandle was 98 percent certain of his opinion that the Hamels' home had suffered wood rot damage exceeding the 10 percent threshold for structural framing members and sheathing between May 1998 to May 1999, during the third Great American policy period. Yeandle stated he was 98 percent certain that, more likely than not, by April 1999, the time of the construction case, many members that were affected by water had experienced advanced wood decay and the Hamels' home, more likely than not, had suffered more than 10 percent damage necessitating repairs. Yeandle opined that in each

13

of those distinct time periods, more likely than not, the Hamels' home suffered additional wood rot decay through the eating of more wood and reduction of more wood mass that such damage would necessitate the repairs he testified about in the underlying construction case.

In Yeandle's opinion, oriented strand board (OSB), which is a ply-wood type board used as sheathing, deteriorates 50 percent faster than wood and he noted that The Wood Institute does not recommend that OSB sheathing be exposed to weather for more than thirty days. To determine the extent to which an area of wall within the Hamels' home had experienced water intrusion, Yeandle followed his protocol for determining the perimeter or boundary, which transitions from rotting and decaying wood to that which is not suffering from wood rot, by visually identifying a water entry point and conducting pin probe scans outward until he had determined the boundaries of the rotted area. In Yeandle's opinion, most of the areas he inspected in the Hamels' home in February 2002, the OSB sheathing, or the substrate, was 100 percent deteriorated as the pin probe test showed no resistance and most of the studs were at least 50 percent to 80 percent deteriorated. The trial court sustained Great American's objection to the admission of Yeandle's January 9, 2009, report into evidence.

During cross-examination, Yeandle stated that he was not attempting to determine the timing of the wood rot damage when he first inspected the Hamels' home in 2002, and clarified that he had never stated that the rate of rot decay is the same for all locations but that the rot was present and occurring. He also clarified that he had not testified that the wood rot had not commenced between October 1995 and May 1996, only that the conditions were not favorable during that period.

Although he had not seen any scientific studies based on empirical data and actual testing

14

that would support the use of a linear model regarding the rate of wood rot or decay, he had seen a model using a linear description of decay, and had used a linear model assumption in this case. Yeandle disagreed that his conclusions would be incorrect if his linear model assumption was incorrect because he had read many articles identifying the timing of wood rot to be eighteen to twenty-four months under proper conditions, it was known that the wood in the Hamels' home had access to water "from day one," he had practical experience discovering walls having advanced wood rot after two and three years, and wood rot is progressive. When asked if he agreed with an article prepared by a biological technician specializing in the biodeteriorization of wood which proclaimed, "There is no way to even crudely estimate the rate of wood decay or its age[,]" Yeandle stated that he did not completely agree because he knew from articles he has studied as well as his own practical experience that when exposed to favorable conditions, yellow pine and fir materials are rotted or have a rotting condition in typically eighteen to twenty-four months. He did agree with a statement from the same article regarding the role of geographical location and climate as factors in wood rot decay, and explained that that was the basis for his use of climatic data in making his assessment of the Hamels' home.

Yeandle admitted on redirect examination that he had not been asked to determine the rate of wood rot decay and had not estimated on a going-forward basis either when wood is going to rot nor its rate of decay. He acknowledged, as indicated by the biological technician's article, that estimating wood rot prospectively is very hard to do. However, Yeandle explained that his opinions were based on a known beginning point, where there was no decay, and a known end point in 2002, when the studs had suffered at least 50 percent deterioration. Yeandle stated that he based his opinions on the 10 percent threshold and resolved the specific question of when, more

15

likely than not, the 10 percent threshold had been reached, thus necessitating repairs to the Hamels' home. He clarified that his assessment model had accounted for water and temperature variables and again opined that once the wood mass loss has exceeded 10 percent, the member must be replaced and it is irrelevant how much damage occurs after that point.

On recross-examination, Yeandle agreed that his opinion testimony regarding the timing of the damage to the home at various times, including April 1999, and thereafter is based in part on his 2002 observations of the home. Yeandle explained that he based his assumptions and conclusions on a linear model considering variables, and stated that he believes the linear method is generally accepted in the scientific community because he has seen it used in different articles. He clarified that the 10 percent loss of mass requiring replacement refers to a 10 percent loss of a section, not the entire member, and acknowledged that he did not take into account different types of mold, different rates of damage that different microorganisms can cause to rot wood, did not perform studies or have knowledge of different species of mold that are airborne in north Texas, and did not send mold samples to be tested by a laboratory. During redirect examination, Yeandle also stated that his testimony regarding 10 percent loss of a section depends on the horizontal or vertical orientation of the board, and explained that, unless the wood is "carrying a beam" or has other concerns, it is more economical to identify the extent of rot and simply replace the rotted wood, "sister" the studs, remove the rot, and apply new sheathing rather than engage an engineer to conduct calculations to determine whether or not a particular board needs to be replaced.

Great American objected to the admission of Yeandle's expert witness testimony based on his qualifications, and specifically complained that: (1) Yeandle is not a microbiologist, has no scientific training, has read some articles, and has looked at some properties that have suffered

16

from "mold" damage; (2) Yeandle's methodology based on a linear method or rate of decay with regard to wood rot is not generally accepted in the scientific community and is therefore speculative and unreliable; and (3) Yeandle's conclusions lack foundation and are unreliable because his opinions are based on his observations made in 2002, grabbing some compost through a hole in 2003, and performing repairs in 2008 or 2009, and do not provide an adequate foundation for him to opine on the state of rot as of April 1999, or during any of the Great American policy periods. Great American also asserted that Yeandle's observations do not permit him to opine on when the repairs that were the subject of the construction trial "had to be done" and argued that it was impossible for Yeandle to opine on the status of rot damage at a previous time without presenting a rate estimate.

The Hamels countered that Great American had mischaracterized the subject on which they were offering Yeandle's expert opinions, which included, first, to determine a reasonable range when, more likely than not, the wood rot occurred, and second, to determine when, more likely than not, the threshold was reached and repairs became necessary. They noted that Yeandle has practical experience involving hundreds of structures, as well as training, certifications, and practical experience relating to wood rot and wood rot remediation. The Hamels argued that they were not attempting to prospectively estimate when the wood rot threshold was met, but rather were attempting to show, based on known facts "what the exposure was, and when it actually more than crossed the line." They reminded the trial court that Yeandle's 2002, 2003, and 2004 tests are absolute, direct evidence of the state of wood rot, and Yeandle also had first-hand knowledge in 2002 that the OSB suffered from 100 percent rot and the studs had suffered at least 50 percent rot. For these reasons, and because of Yeandle's extensive

17

experience inspecting structures with a known completion date for wood rot, the Hamels argued Yeandle was qualified to opine on the facts of this case. The trial court agreed and overruled Great American's objections to the admission of Yeandle's expert witness testimony.

Robert Nicholas, who is a registered professional engineer in Texas and New Mexico and received his degree in civil engineering in 1996, also testified as an expert in the coverage case. During college, Nicholas took a design course for wood members which "touched briefly" on wood rot. He has reviewed articles and scientific materials regarding wood rot, including an article on the biodecomposition of wood, several articles addressing types of fungi that attack wood, and others providing guidance in the testing for wood rot.[7] Nicholas has also reviewed online articles regarding wood rot and linear systems analysis. He relied on these articles in reaching some of his opinions about the Hamels' home.

As a structural engineer, Nicholas has worked on approximately thirty to forty-five projects involving wood rot over a fifteen-year span. Nicholas has seen very new homes that have had a considerable amount of wood rot for being only a couple of years old. In his professional opinion, Nicholas agrees that when wood loses 1 percent weight loss, it loses toughness from 6 percent to less than 50 percent, and by the time decay reaches 10 percent, most strength loss may be expected to exceed 50 percent.

Nicholas was asked to determine at what point the wood in the Hamel home was affected by wood rot and at what point the wood suffered enough damage to be repaired or replaced. Nichols testified that he had attempted to show this in the form of a graph and noted that where the threshold of 10 percent wood mass loss occurs, it is his professional opinion that wood needs to be

---

[7] The articles Nicholas read were titled, *Concepts in the Development of New Accelerated Text Methods for Wood Decay*, *Durability and Disaster Mitigation in Wood-Framed Housing*, *Predicting the Effects of Decay on Wood Properties and Modeling Residual Service Life,* and *Limiting Conditions for Decay in Wood Systems*.

repaired or replaced. Nicholas agreed that when weight loss resulting from decay reaches 10 percent, strength loss may exceed 50 percent, and explained that the variables affecting fungal growth include moisture, temperature, and wood as a food source. He agreed that wood rot decay ceases in progression at temperatures as low as thirty-five degrees and as high as one hundred degrees, that wood with visually discernible decay has been greatly reduced in all strength values, that most articles are consistent regarding these aspects of decay and loss of strength, and that these and the prior conclusions and variables are, to his knowledge, universally accepted in the engineering and scientific communities. Nicholas opined that, regardless of its vertical or horizontal orientation, lumber that has suffered at least 10 percent wood mass loss has lost a significant or a material amount of its toughness or structural characteristics necessitating replacement, and noted that his opinion is consistent with all the literature and articles he has read. He explained that in residential construction where two-by-four or two-by-six members have suffered wood rot, it is more economical to replace the member, whereas it may be more economical to have an engineer analyze a heavy beam to see if it can be repaired rather than being replaced.

Consistent with the literature he has read, Nicholas assumed that the decay started six months after the Hamels' home was constructed and constructed a linear analysis based on the knowledge that Yeandle had identified in 2002, different rates of decomposition in the walls of the Hamels' home with the studs experiencing 50 percent decay and the OSB suffering decay as high as 100 percent. He then constructed a linear graph for a straight rate of decay and then adjusted it for varying rainfall based on data from the National Weather Service. Nichols explained that he did not adjust for temperature because temperature is relatively consistent, noting that spring and

19

fall are the optimal growth times for the wood rot because the temperatures are between fifty and ninety degrees, and that summer will have a little more growth than in winter.

In his written report, Nicholas had concluded that the fungi would commence growth after the first significant rain event while the temperature was favorable and would continue to grow as long as there was sufficient moisture and temperatures between fifty and one hundred degrees. Nicholas assumed that the difference in decay would be approximately 5 percent between dry and wet years, except in 1997, which was an "El Nino" year and, based on National Weather Service data, had significant rainfall. He explained that when lumber is first purchased or installed, its humidity is typically 18 percent to 21 percent. He explained that studies have shown that when humidity is above 20 percent, fungus begins to grow very slowly, and when the humidity reaches 25 percent to 30 percent, the environment is more optimal for fungus, but Nicholas agreed that wood does not require 50 percent saturation for fungus to grow. Nicholas explained that as the fungus moves from the surface of the wood to the interior of the member, the waste material, or compost, will continue to hold moisture and add to the moisture content of the wood, creating an insulation layer that aids in creating a better environment for the acceleration of fungal growth, and will also hold the temperature in the optimal range that the fungus favors.

Nicholas explained that the average time span required for wood rot decay to reach an advanced stage when conditions are optimal can be within one to two years for OSB but a bit longer for lumber, and noted that he had seen lumber that was in severe need of repair, especially in scenarios where roof problems exist, within two or three years if water directly contacted the lumber each time it rained. In his experience, and based on all the scientific and engineering literature Nicholas has reviewed about fungus, when environmental conditions exist, wood that

20

has begun to rot will reach an advanced state of decay and must be replaced after eighteen to thirty months.

Nicholas explained that there is a general consensus that when there is a 10 percent loss in wood mass, repair becomes necessary, and when significant losses occur, the wood no longer has the properties to withstand loads. Very small amounts of material loss or mass loss occur very quickly because both the cross-sectional area and properties of the wood are changing. Based on Yeandle's field investigation, Nicholas opined that a member with 50 percent loss in the Hamels' home had been reduced to something softer such as balsa wood.

In his work as an engineer, Nicholas has personal experience in investigating residences that have suffered wood rot and decay, and explained that in instances where the start of the problem is known, which is typically going to involve new construction with construction defects or a plumbing leak after the water is turned on, signs of wood rot will be visible. If caught quickly enough, mitigation may take place and the wood may be saved. When one year to eighteen months have passed, replacement or repairs to the structure are typically needed. Nicholas noted that it is of no consequence that the Hamels' home needed repairs or replacements in 2002, because once a member needs to be repaired, any additional damage is not going to increase, and the cost will be the same whether the member is 50 percent or 100 percent decayed. In Nicholas' opinion, the most relevant inquiry is the point at which the 10 percent threshold is crossed.

In Nicholas' opinion, more likely than not, wood rot in the Hamels' home had not progressed to a level that necessitated repairs by May 1996, because the temperatures had not been favorable, but had, more likely than not, progressed to a point necessitating repairs in the first policy period between May 1996 and May 1997, especially for the OSB. Nicholas stated he was

21

75 percent certain of his opinion regarding the existence and level of wood rot in the first policy period, and was 95 percent certain of his opinion that the wood rot resulting from defects that were the subject of the construction case, more likely than not, necessitated repairs during the second policy period between May 1997 and May 1998. Nicholas was 98 percent certain of his opinion that the wood rot in the Hamels' home necessitated repairs by the third policy period, between May 1998 and May 1999. In all the instances in which Nicholas had addressed known water intrusion problems exceeding two years, the wood members had rotted to a point that greatly exceeded a 10 percent section loss, as well as loss of mass. In Nicholas' opinion, more likely than not, the OSB damage in the Hamels' home occurred during the first policy period and the stud damage occurred in the second policy period. Nicholas was not aware of any literature, studies, scientific data, or anything in his personal experience which supported the proposition that the wood rot in the Hamels' home did not necessitate repairs prior to May 1999, and thereafter rapidly accelerated until its discovery in 2002, and noted that most of the data and research is contrary to that proposition. Nicholas believed an opinion supporting such a theory is both unreasonable and unsupported by studies, literature, and articles.

Nicholas referenced a graph he prepared for the purposes of showing his estimates that materials that were 100 percent decayed in 2002 would probably be 100 percent decayed in 2009, and materials that were 50 percent decayed in 2002 would probably be close to 100 percent decayed in 2009. Nicholas stated that the graph was also prepared to test his opinions with what Yeandle had observed in late 2008 or early 2009 when he made repairs to the Hamel home, and it confirms that his opinions are reasonable. Over Great American's objection that Nicholas' graph was a demonstrative aid, the trial court admitted the graph into evidence.

22

Although he believed all of the articles he presented support his opinion, Nicholas found one particular article, *Concepts in the Development of New Accelerated Test Methods for Wood Decay*, to be particularly supportive of his opinions and conclusions in this case. That article addresses some of the difficulties encountered by those in his profession with regard to real time versus accelerated testing of wood decay, and explained that the study in this particular article which involved two controls, decay commenced after ten to twelve months, progressed in a linear fashion until 40 percent decay was reached, and then began to slow slightly. Nicholas stated that the graph from the study set out in the article confirms his opinions and would show that his model is actually very conservative. He again explained that decay progresses very rapidly at first, then slows as total failure is reached, but agreed that the study supports the concept that wood rot progresses at a relatively constant rate, with acceleration at the outset and deceleration as the food source is depleted.

Nicholas had reviewed Yeandle's opinions and heard his testimony, and believed Yeandle's opinions were reasonable. Nicholas agreed that TMB had a duty to inspect all of the work performed by its subcontractors and GSM to ensure that the work was performed in a good and workmanlike manner, that TMB could not complete the home in such manner in accordance with the plans without inspecting the work of the prior contractor, and that TMB had a duty to inspect the construction and inform the Hamels if any work performed by a GSM, TMB, or subcontractors at the Hamel home was not completed in a good and workmanlike manner. Nicholas stated that his opinions are based upon the defects addressed in the construction case and the resulting damage that occurred as a result of the water infiltration within the points of entry.

Nicholas' curriculum vitae was tendered into evidence without objection. On cross-examination, Nicholas stated that the Hamels had retained him in September 2009. He stated that he had no degree in microbiology, no specialized training in wood rot, had not conducted any scientific studies on wood rot, and had never inspected the Hamels' home. Nicholas explained that his wood design course had examined the causes of wood rot with a focus on prevention. Nicholas agreed that his opinions were dependent on the factual observations of Yeandle. Nicholas stated that he assumed that the moisture content throughout the home was somewhat uniform with variances based on weather but assumed that it was optimal to grow fungus. He clarified, however, that with regard to the rate of decay based on Yeandle's observations, while he did assume the rate to be fairly constant, he did not assume that all OSB was 100 percent decayed or that all studs were 50 percent decayed. He agreed that his graph includes an assumption that 100 percent decay represents 100 percent decay regardless of its location within the house. He further explained that he based his 5 percent adjustment for wetter and drier years on the fact that the migrating water was in a closed environment that did not permit the water to escape and, rather than increasing or decreasing the percentage of decay in any year, the closed environment operated to maintain optimal conditions. Nicholas stated that he did not select 5 percent based on any mathematical calculation but did consider that percentage "to be [on] the high side" because, "for the most part, [the rate of decay is] going to be fairly consistent." Nicholas did not factor density variations into his analysis but rather assumed wood density to be a constant because density throughout a single member is consistent. Nicholas explained that he did not account for different microorganisms that give rise to wood rot because he had observed

photographs of the rot in the Hamel home and noted that it appeared to be brown rot, "the ground fungus, which is pretty common," and which "most of the research supports[.]"

According to Nicholas, most of the methods used in the field involve observation and are very conservative. He opined that all OSB and wood members found to have 50 percent to 100 percent damage in 2002, were in need of repair prior to 1999.

On redirect examination, Nicholas agreed that he was not offering an opinion regarding the occurrence of wood rot from October 1995 to May 1996. He explained that the Hamels' home had untreated wood, and again stated that wood that is in an enclosed environment has a relatively consistent environment that is more favorable for wood rot than wood that is exposed to the outdoors. In support of his use of linear modeling during recross-examination, Nicholas recalled before the court his examination of other studies where linear progression had been shown and linear modeling had been applied.

## DISCUSSION

In five issues, Great American appeals the trial court's entry of judgment in favor of the Hamels.

### Standard of Review

In a bench trial, the trial court is the fact finder and, as such, is the sole judge of the credibility of the witnesses. *Southwestern Bell Media, Inc. v. Lyles,* 825 S.W.2d 488, 493 (Tex.App. –Houston [1st Dist.] 1992, writ denied). In non-jury trials, the trial court's findings of fact "have the same force and dignity as a jury's verdict upon [jury] questions." *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). A trial court's findings are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing

25

evidence supporting a jury's answer. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)(citation omitted).

When a complete reporter's record is made a part of the record on appeal, the trial court's "findings of fact are not conclusive on appeal if the contrary is established as a matter of law or if there is no evidence to support the findings." *See Ramsey v. Davis*, 261 S.W.3d 811, 815 (Tex.App. –Dallas 2008, pet. denied). We are bound by unchallenged findings of fact unless contrary findings are established as a matter of law or no evidence supports them. *Milton M. Cooke Co. v. First Bank & Trust,* 290 S.W.3d 297, 303 (Tex.App. –Houston [1st Dist.] 2009, no pet.)(citing *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 696 (Tex. 1986)).

In reviewing a "no evidence" point of error, a reviewing court may consider only the evidence and inferences that tend to support challenged findings and will disregard all evidence and inferences to the contrary. *Catalina*, 881 S.W.2d at 297. If there is more than a scintilla of evidence to support the findings, the "no evidence" challenge cannot be sustained. *Catalina*, 881 S.W.2d at 297.

Conclusions of law are not subject to challenge for factual sufficiency, but we may review a trial court's conclusions drawn from the facts to determine their correctness. *Rogers v. City of Fort Worth,* 89 S.W.3d 265, 277 (Tex.App. –Fort Worth 2002, no pet.). We overrule a challenge to fact findings that form the basis of a conclusion of law or disposition when the appellant does not challenge other fact findings that support that conclusion or disposition. *Milton M. Cooke Co.,* 290 S.W.3d at 303; *Raman Chandler Props., L.C. v. Caldwell's Creek Homeowners Ass'n, Inc.,* 178 S.W.3d 384, 397 (Tex.App. –Fort Worth 2005, pet. denied); *see also Oliphant Fin. L.L.C. v. Hill,* 310 S.W.3d 76, 77 (Tex.App. –El Paso 2010, pet. denied)(appellant must attack all

26

independent bases or grounds that fully support a complained-of ruling or judgment, or appellate court must affirm the judgment or ruling).

*Issues*

**ISSUE ONE**

In its first issue, Great American argues the trial court erred in finding it liable "for the underlying judgment[.]" Great American presents three sub-arguments in support of this contention.

First, relying on *State Farm Fire and Cas. Co. v. Gandy*, 925 S.W.2d 696, 714-15 (Tex. 1996), Great American argues the trial court's judgment against its insured, TMB, is not binding on Great American under *Gandy* because the judgment in favor of the Hamels did not result from an "actual trial." Great American urges that "[t]he actual trial conditions of the Great American policies were not complied with," and, last, posits that the construction-case judgment was the result of fraud and collusion.

Without citation to the 22-volume clerk's record or the 20-volume reporter's record in its argument, Great American proceeds to complain that the trial court's "findings and conclusions" numbered 28, 30-38, 42, 44, 45, 48, 49, 51-53, and 69 in the coverage case are unsupported by the evidence or supported by no evidence. It also complains that Finding 52, in which the trial court found Great American was bound by the findings of fact and conclusions of law in the construction suit, is contrary to Texas law under *Gandy*.

*Analysis*

We begin our analysis by considering Great American's "actual trial" complaint. Great American alleges that its policies contain a condition precedent and provide that suit may only be

27

brought to recover on a judgment that is "obtained after an actual trial." Great American fails to provide citation to the record wherein this provision may be found in any of its five policies. However, because it has complained that the trial court erred in Finding 49, in which the court found and concluded that the construction suit constituted an actual trial, we proceed to address this contention. Together with Finding 49, we also consider Great American's complaints regarding Findings 53 and 69. In Finding 53, the trial court found and concluded that Great American breached its contractual obligations to TMB by failing to provide a defense to the Hamels' claims and by failing to indemnify TMB from the construction-case judgment. In Finding 69, the trial court concluded that all conditions precedent to recovery had been performed, had occurred, or had otherwise been waived.

Although Great American fails to provide an examination of the findings and conclusions about which it complains in Issue One, we observe the trial court found that Mitchell's testimony at trial was truthful and not unduly influenced or affected by the stipulations or any agreement or understanding between the parties, that TMB defended itself in good faith, and found and concluded that the construction judgment was not an agreed or consent judgment. The trial court found and concluded that both the Hamels' and TMB's strategies, actions, and inactions during the pretrial, discovery, and trial of the construction case were reasonable and conducted for a proper purpose, and were not collusive or fraudulent. It determined as a finding and a conclusion that Great American breached its contractual duty by failing to provide TMB a defense to the Hamels' claims and by failing to indemnify TMB from the construction judgment. The trial court concluded that Great American was bound by the findings of fact and conclusions of law entered in connection with the construction judgment because they were necessary or relevant to the trial

28

court's determination of TMB's liability and the Hamels' damages in that suit, and it also concluded that Great American is bound by the construction-case judgment. Upon our review of the record, we hold the trial court's findings and conclusions in the coverage case are supported by sufficient evidence in the record.

Texas courts and federal courts applying Texas statutory and case law long and consistently have held that an insurance company cannot insist on compliance with an "actual trial" requirement within its insurance contract where the insurer has breached its duty to defend. *Scottsdale Ins. Co. v. Sessions*, 331 F.Supp.2d 479, 488 (N.D. Tex. 2003); *Gulf Ins. Co. v. Parker Products, Inc.*, 498 S.W.2d 676, 679 (Tex. 1973); *see also Pioneer Cas. Co. v. Jefferson*, 456 S.W.2d 410, 413 (Tex. Civ. App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.)(finding that where insurer refused to defend and insured's attorney appeared at trial to admit liability on behalf of insured who did not appear at bench trial, witnesses were sworn and trial court heard evidence and rendered judgment in favor or third person, and all tendered testimony was in the record, judgment arose from "actual trial," and noting that an insurer who wrongfully refuses to defend its insured is barred from insisting on compliance with the insurance contract). An insurer's duties to defend and to indemnify are typically separate and distinct obligations. *King v. Dallas Fire Ins. Co.,* 85 S.W.3d 185, 187 (Tex. 2002). The insurer's duty to defend arises when a third party sues the insured on allegations that, if taken as true, potentially state a cause of action within the terms of the policy.[8] *See Vines-Herrin Custom Homes, LLC v. Great American Lloyds Ins. Co.*, 357

[8] In Finding 26, the trial court in the coverage case found that Great American's claims administrator "timely received copies of all petitions in the Construction Lawsuit; received communications and correspondence regarding the Construction Lawsuit; and had a reasonable opportunity to participate in the Construction Lawsuit." In Finding 27, the trial court found that Great American denied TMB a defense and coverage and "voluntarily did not participate during the trial of the Construction Lawsuit." Great American does not challenge these findings. Great American does challenge the trial court's conclusion that Great American waived its right to insist on TMB's compliance with conditions precedent to policy coverage and also waived its right to control the defense of TMB.

S.W.3d 166, 172 (Tex.App. –Dallas 2011, pet. denied).

Under the eight-corners rule, we determine the duty to defend by the claims alleged in the petition and by the coverage provided in the policy. *See Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 13 (Tex. 2007); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997). When applying the eight-corners rule, we interpret the allegations in the petition liberally and resolve in the insured's favor any doubts regarding whether the allegations trigger a defense by the insurer. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 939 S.W.2d at 141 (citing *Heyden Newport Chem. Corp. v. So. Gen. Ins. Co.*, 387 S.W.2d 22, 26 (Tex. 1965)). Consequently, an insurer's duty to defend is limited by the claims actually asserted in an underlying suit. *Pine Oak Builders, Inc. v. Great American Lloyds Ins. Co.,* 279 S.W.3d 650, 655 (Tex. 2009).

Great American's CGL policies provide that it "will pay those sums that the Insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies" that is caused by an occurrence that occurs during the policy period. Exclusion "*l*" of Great American's CGL policies provide that insurance does not apply to "'[p]roperty damage' to 'your work' arising out of it or any part of it[.]" However, the policies provide an exception to this exclusion which states, "This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor."

In the construction suit, the Hamels' petition alleged, in part, the following: (1) that their home was constructed in 1995 and 1996, initially by GSM and then, after GSM failed to complete the home, by TMB as general contractor; (2) that TMB had agreed to ensure that their residence was built in a good and workmanlike manner, to hire and supervise skilled and competent

30

subcontractors, and ensure that their work was done in a good and workmanlike manner even though they were independent of TMB; (3) that TMB retained the right and had the duty to control and supervise the subcontractors and ensure that their work was done properly and completed timely, and that, although TMB did not actually perform the construction, it was primarily responsible to oversee the subcontractors and ensure the subcontractors performed their work properly; (4) that water damage was first noticed in early 2000 and investigations thereafter in 2000, 2001, and 2002 revealed multiple sources of infiltration and different areas of damage arising from defective or deficient construction of the home as set forth in the petition; (5) the primary sources of water infiltration which caused collateral and resultant damage involved elements of construction that were constructed or installed by subcontractors of TMB or GSM. The Hamels' petition next sets forth causes of action for breach of implied warranty, negligence, deceptive trade practices, and violations of the Residential Construction Liability Act.

The allegations in the Hamels' petition, if taken as true, adequately state a potential cause of action within the policy periods and triggered Great American's duty to defend its insured, TMB, in the construction-liability suit. *See Vines-Herrin*, 357 S.W.3d at 172. Consequently, the trial court's findings and conclusions that Great American had a duty to provide a defense to TMB and wrongfully refused to do so are supported by evidence in the record.

Great American argues that its refusal to defend TMB occurred before the Supreme Court handed down its injury-in-fact rule in *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 28-29 (Tex. 2008), and that the Hamels' complained-of injury initially manifested during a later policy wherein an EIFS exclusion purportedly removed the injury from coverage under Great American's later-issued fourth and fifth policies. However, as the Supreme Court did in *Don's*

31

*Bldg.,* we observe that Great American's policies fail to provide that its duty to defend TMB "is triggered only when the injury manifests itself during the policy term, or that coverage is limited to claims where the damage was discovered or discoverable during the policy period." *See id.*

Because the evidence supports the trial court's finding that Great American breached its contractual duty to provide TMB a defense to the Hamels' claims in the construction case, it is barred from contesting compliance with the "actual trial" provisions of the contract. *See Scottsdale Ins. Co.*, 331 F.Supp.2d at 488; *Gulf Ins. Co.*, 498 S.W.2d at 679; *see also Pioneer Cas. Co.*, 456 S.W.2d at 413.

We next address Great American's invalid-assignment argument under *Gandy*. In *Gandy,* the Texas Supreme Court held that an insured's assignment of his claims against his insurer to a plaintiff is invalid if: (1) it is made prior to an adjudication of plaintiff's claims against the insured in a fully-adversarial trial; (2) the insurer has tendered a defense; and (3) either (a) the insurer has accepted coverage or (b) the insurer has made a good faith effort to adjudicate coverage issues prior to the adjudication of the plaintiff's claim.[9] *Gandy*, 925 S.W.2d at 714. The *Gandy* Court declined to address whether an assignment is invalid if one or more of the recited elements is lacking but declared that in no event is a judgment, rendered in favor of a plaintiff against an insured without a fully-adversarial trial, binding on the insured's insurer or admissible as evidence of damages in an action against the insurer by plaintiff as the insured's assignee. *Gandy*, 925 S.W.2d at 714-15. The Court also noted that "[n]ot every settlement involving an assignment of

---

[9] The *Gandy* Court initially assessed and declared violative of public policy Mary Carter agreements. *Gandy*, 925 S.W.2d at 709-10. A Mary Carter agreement is "any settlement arrangement between the plaintiff and some of the defendants in a case by which the settling defendants agree to pay the plaintiff a certain amount of money and to participate in the trial against the nonsettling defendants, and the plaintiff agrees to release the settling defendants from liability and, if the judgment against a nonsettling defendant is large enough, to repay the settlement amount" and, "[i]n effect, the plaintiff assigns the settling defendants part of plaintiff's claim against the nonsettling defendants." *Gandy*, 925 S.W.2d at 709.

rights in exchange for a covenant to limit the assignor's liability" is problematic, as when a settlement follows an adversarial trial, because the difficulties in evaluating a plaintiff's claims are no longer present and the value has been fairly determined. *Gandy*, 925 S.W.2d at 714. More recently in *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 673 (Tex. 2008), the Texas Supreme Court clarified that "*Gandy's* holding was explicit and narrow, applying only to a specific set of assignments with special attributes" and that "[b]y its own terms, *Gandy's* invalidation applies only to cases that present its five unique elements."

The facts in the instant case are readily distinguishable from those in *Gandy*. First, the construction case between the Hamels and TMB involved a trial to the bench and resulted in a judgment, unlike *Gandy* which involved a pretrial assignment of rights. *Gandy*, 925 S.W.2d at 697-98, 711. Second, assuming momentarily that a "fully adversarial trial" occurred in the construction case, which we address separately, none of the *Gandy* elements are present. *Id*. at 714. TMB's assignment of its claims against Great American was made post-judgment. *See Insurance Network of Texas v. Kloesel*, 266 S.W.3d 456, 466 (Tex.App. –Corpus Christi 2008, pet. denied)(insured's assignment of claims against insurer after third-party obtained judgment in a fully-adversarial trial failed to meet *Gandy* requirements for invalidating the assignment of the insured's claims). Moreover, there is no evidence that Great American ever tendered a defense, ever accepted coverage, or ever made a good-faith effort to adjudicate coverage issues prior to the adjudication of the Hamels' claims against TMB. *See Gandy*, 925 S.W.2d at 714.

*Gandy* requires "a fully adversarial trial" when considering the validity of an assignment of claims against an insurer, but fails to define that term. *See Gandy*, 925 S.W.2d at 714. In Findings 30-32, 34-36, 42, 44-45, the trial court in the coverage case: (1) found that the testimony

offered at the construction trial was truthful and not unduly influenced or affected by stipulations or any agreement or understanding between the parties; (2) found and concluded that all evidence and testimony admitted in the construction trial was truthful; (3) found that TMB appeared at the construction trial and defended itself in good faith; (4) found and concluded that the judgment in the construction case was not an agreed or consent judgment; (5) found and concluded that TMB's and the Hamels' strategies, action, and inaction, both pretrial, during discovery, and at trial, including preparation for and presentation of their respective cases at the construction trial were reasonable and conducted for a proper purpose, and concluded that such action, inaction, and strategies were not collusive or fraudulent; (6) found that the fact that the parties entered into stipulations in lieu of discovery responses is no evidence of lack of adversity, but rather is proper and in keeping with procedural ethical obligations to stipulate to matters not in dispute; (7) found and concluded that the construction trial was a genuine contest of issues resulting in an adversarial proceeding; and (8) found and concluded that the construction trial and the resulting judgment were not products of collusion, and that there was no fraud in either the construction trial or in obtaining of the construction judgment.

In support of its complaints that no fully-adversarial trial occurred in the construction case, Great American relies upon *State Farm Lloyds Ins. Co. v. Maldonado*, 963 S.W.2d 38 (Tex. 1998), *Yorkshire Ins. Co. v. Seger*, 279 S.W.3d 755 (Tex.App. –Amarillo 2007, pet. denied), and our opinion in *American Eagle v. Nettleton*, 932 S.W.2d 169 (Tex.App. –El Paso 1996, writ denied). We find these cases to be factually distinguishable as each of those cases involved a pretrial settlement. In *Maldonado*, the insured and plaintiff agreed to split any recovered insurance proceeds and the insurer, who tendered a defense, was entitled to demand compliance with the

34

policy's "actual trial" requirement. *Maldonado*, 963 S.W.2d at 40-41. *Seger* involved a settlement followed by a *Stowers* claim and a directed verdict. *Seger*, 279 S.W.3d at 768-73. In *Nettleton*, a pretrial, non-execution agreement requiring judgment in favor of Nettleton against one or more insureds was executed, and the insurer tendered a pretrial offer which Nettleton declined. *Nettleton*, 932 S.W.2d at 171-72. The trial court then granted summary judgment in Nettleton's favor. *Id.* In each of those cases, the insured did nothing at trial, or counsel appeared but asked no questions.

Unlike those cases, during trial of the Hamels' construction case, TMB's counsel asked questions of witnesses and elicited evidence favorable to its defense of TMB in the construction-case trial. This included evidence that: (1) the defects, other than the defective shower, were constructed by GSM rather than TMB; (2) the project was 60-70 percent complete when TMB became involved in the construction; (3) the roof was not constructed under TMB's watch; (4) the roof deck, roof valleys, and flat roof were already constructed when TMB took over the construction; (5) an inspector for the City of Flower Mound and another building inspector inspected the construction upon completion and determined that the newly-constructed home "passed" inspection; and (6) the Hamels' expert, Donald Yeandle, had been asked on the day of trial if he would make an offer on the house and had replied that he had in fact already done so. TMB also elicited Yeandle's testimony that the city inspector who approved the home after inspection had been negligent on two issues, one of which involved the failure to identify the holes at the top of the fascia board.

The Hamels contend their complained-of agreement with Mitchell was executed to ensure that Terry Mitchell would appear at trial and that TMB had not defaulted and would not default so

35

that their issues could be litigated and determined by the trial court. Moreover, the Hamels argue that the agreement not to execute on Mitchell's tools of the trade and to refrain from adding Mitchell, individually, as a party to the coverage case was not improper and was not collusive because other legal provisions prohibited them from executing on Mitchell's tools, equipment of trade, and vehicles, and because they had no basis for bringing Mitchell, individually, into the suit. *See* TEX. PROP. CODE ANN. § 42.002 (West 2014); TEX. BUS. CORP. ACT art. 2.21(A)(2) *now codified at* BUSINESS ORG. CODE § 21.223 (West 2012).

The record shows the construction case was fully tried in a bench trial in which the trial court was well-engaged. Mitchell testified that he did not discuss the substance of his testimony with the Hamels and that his testimony was not influenced by his agreement with them. Although Mitchell's testimony was candid and forthright about the existence of TMB's duties in relation to the inspection of the home, TMB's oversight of the subcontractors' work, and TMB's failure to meet those obligations, he also presented evidence that the Hamels' home was more than half-way constructed before he accepted those duties.

Although Great American complains of the pretrial stipulations made between the parties, it does not demonstrate that the complained-of stipulations were ever used in the trial of the construction case. We note that many, and perhaps all, of the facts set forth in the stipulation were adduced by witnesses who testified at trial.

We conclude the record shows a fully-adversarial trial of the claims in the construction case. The trial court's findings are supported by the evidence and its conclusions of law are correct. *Gandy* is inapplicable and does not render invalid TMB's assignment of its claims against Great American. *Gandy*, 925 S.W.2d at 714-15. Great American has failed to

36

demonstrate that the evidence shows the construction judgment was fraudulent or that the Hamels and TMB acted in a collusive manner to obtain the judgment rendered by the court.

Because the trial court's findings and conclusions are not erroneous and are supported by sufficient evidence, Issue One is overruled.

## ISSUE TWO

In Issue Two, Great American complains the trial court erroneously admitted and considered expert testimony regarding the timing of the damage to the Hamels' home and alleges that the expert testimony is both incompetent and amounts to "no evidence." Great American specifically complains that the trial court should have excluded the testimony offered by the Hamels' experts, Don Yeandle and Robert Nicholas. It asserts that both Yeandle and Nicholas are "unqualified," and, as a consequence, complain the foundational data underlying their opinions is unreliable, their methodology in interpreting the underlying data is flawed, an analytical gap exists between the data and the experts' conclusions, and each failed to rule out other possibilities.

*Standard of Review*

A trial court has broad discretion to determine the admissibility of expert testimony. *State v. Petropoulos*, 346 S.W.3d 525, 529 (Tex. 2011); *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 629 (Tex. 2002)(although trial court serves as evidentiary gatekeeper by screening out irrelevant and unreliable expert evidence, its discretion to determine the admissibility of evidence is broad); *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 499 (Tex. 2001). For an expert's testimony to be admissible, the expert witness must be qualified by knowledge, skill, experience, training, or education, and his or her testimony must be relevant and based upon a reliable foundation. TEX. R. EVID. 702; *see State v. Cent. Expressway Sign Assocs.,* 302 S.W.3d 866, 870 (Tex. 2009);

37

*Zwahr,* 88 S.W.3d at 628; *Helena Chem. Co.*, 47 S.W.3d at 499. To be relevant, the expert's opinion must be based on the facts; to be reliable, the opinion must be based on sound reasoning and methodology. *Cent. Expressway Sign Assocs.,* 302 S.W.3d at 870; *see also Zwahr,* 88 S.W.3d at 629.

### *Qualification*

A trial court's acceptance of an expert's qualifications is reviewed for an abuse of discretion. *Broders v. Heise,* 924 S.W.2d 148, 151 (Tex. 1996). The role of the trial court in qualifying experts is to ensure "that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Id*. at 152.

The offering party must demonstrate that the expert witness possesses special knowledge as to the very matter on which he proposes to offer an opinion. *See Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 718 (Tex. 1998). However, the degree of knowledge, skill, education, training, or experience a witness should have before he is deemed qualified to testify as an expert is directly related to the complexity of the field about which his testimony is proposed. TEX. R. EVID. 702; *see Broders*, 924 S.W.2d at 153. "A significant part of the trial court's gatekeeper function is to evaluate the expert's qualifications, listen to the testimony, view the evidence, and determine which factors and evaluation methodology are most appropriate to apply." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 579 (Tex. 2006).

### *Analysis*

The trial court conducted a hearing to consider Great American's motions to exclude as evidence the testimony of Donald Yeandle and Robert Nicholas and, at the conclusion of the evidence, denied Great American's motions. We disagree with Great American's contentions

38

and determine the trial court did not abuse its discretion when it admitted the testimony of Yeandle and Nicholas at trial. Great American asserts that Yeandle and Nicholas failed to demonstrate any specialized knowledge that qualified them to proffer opinions as to the rate of decay or when the damage to the Hamels' home occurred. The record sets out sufficient evidence to support the trial court's acceptance of these experts' qualifications based on skill and experience.

Great American concedes that Yeandle is qualified to testify that he discovered rot in the Hamels' home in 2002 and that the rotted wood required repair. However, it complains that Yeandle is not qualified to opine regarding the rate of growth of wood rot fungus, specifically that it did not begin until May 1996, and continued at a rate requiring replacement by April 1999, or regarding the moment at which the rot led to sufficient deterioration of structural members to require repair.

At trial, Great American complained that Yeandle is not a microbiologist. A college degree is not a prerequisite for a witness to qualify as an expert. *See Glasscock v. Income Property Servs.*, 888 S.W.2d 176, 180 (Tex.App. –Houston [1st Dist.] 1994, writ dism'd). Yeandle's extensive experience in examining and repairing homes suffering from wood rot was presented to the trial court and we need not again recite his credentials here. An expert's qualifications may be based on sufficient practical experience. *See Schneider v. Lynaugh*, 835 F.2d 570, 576 (5th Cir. 1988).

Although Nicholas is a licensed professional structural engineer with a civil engineering degree, Great American also complains that Nicholas is not a microbiologist and lacks specific experience or training to substantiate his opinion. Nicholas discussed in depth his understanding of scientific articles he read and relied upon in forming his opinions, explained that he learned

39

about causation and prevention of wood rot in a wood design course, and explained he had experience in dealing with wood rot in 30 to 45 homes. Although Great American complains of it, Nicholas was permitted to base his opinions or inferences on the facts of data of this case as perceived by, reviewed by, or made known to him at or before the hearings or trials. TEX. R. EVID. 703. As an expert, Nicholas was permitted to base his opinions and conclusions on facts and data of which he had no first-hand knowledge. *See* TEX. R. EVID. 703 (providing that expert may base opinion on facts or data "perceived by, reviewed by, or made known to" him and may consider evidence that would be otherwise inadmissible if it is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject"); *In re Christus Spohn Hosp. Kleberg,* 222 S.W.3d 434, 440 (Tex. 2007)(orig. proceeding)(holding that experts may rely on hearsay, privileged communications, or other information); *Control Solutions, Inc. v. Gharda USA, Inc.,* 394 S.W.3d 127, 160 (Tex. App.—Houston [1st Dist.] 2012, pet. filed)(Texas law has long maintained expert witnesses are permitted to rely upon information about which they have no personal knowledge).

Testimony by experts is permitted when it will assist the trier of fact to understand the evidence or determine a fact in issue. TEX. R. EVID. 702. All proceedings in the construction and coverage cases were tried to the bench. Absent a clear abuse of discretion, we will not disturb the trial court's determination regarding the qualifications of a specific witness to testify as an expert. *See United Blood Svcs. v. Longoria*, 938 S.W.2d 29, 30-31 (Tex. 1997).

Both Yeandle and Nicholas were qualified to testify as experts based on their specialized knowledge, skill, and experience regarding the specific issue before the court which qualified them to give an opinion on the particular matter. *See* TEX. R. EVID. 702; *In re Commitment of*

*Bohannan*, 388 S.W.3d 296, 304-05 (Tex. 2012), *cert. denied*, 133 S.Ct. 2746, 186 L.Ed.2d 202 (2013)(test is whether offering party has established that expert has knowledge, skill, experience, training, or education regarding specific issue before the court which would qualify expert to give an opinion on that particular matter); *see also Cent. Expressway Sign Assocs.,* 302 S.W.3d at 870; *Zwahr,* 88 S.W.3d at 628; *Helena Chem. Co.*, 47 S.W.3d at 499; *Gammill,* 972 S.W.2d at 718.

*Relevance and Reliability*

We next address Great American's complaints regarding the experts' reliability. An expert's testimony is relevant if it assists the fact finder in determining an issue or in understanding other evidence. TEX. R. EVID. 702. Expert testimony which is based on an unreliable foundation or flawed methodology is unreliable and fails to satisfy the relevancy requirement of Rule 702. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556-57 (Tex. 1995)(discussing Rule 702).

When the reliability of an expert's testimony is challenged, the trial court should ensure that the opinion comports with applicable professional standards. *See Helena Chem. Co.*, 47 S.W.3d at 499; *Gammill*, 972 S.W.2d at 719. To assist the trial court in making that determination, the Texas Supreme Court in *Robinson* suggested several factors to be considered when assessing the admissibility of expert testimony under Rule 702. *Robinson,* 923 S.W.2d at 557. These factors include: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or

41

technique. *Robinson,* 923 S.W.2d at 557.

Emphasizing that the foregoing factors are non-exclusive and do not fit every scenario, the Texas Supreme Court has explained that, as a gatekeeper, the trial court "must determine how the reliability of particular testimony is to be assessed." *Gammill*, 972 S.W.2d at 726. "Rather than focus entirely on the reliability of the underlying technique used to generate the challenged opinion, as in *Robinson*," the Supreme Court has found it appropriate in some cases "to analyze whether the expert's opinion actually fits the facts of the case." *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 235 (Tex. 2010)(citing *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 904-05 (Tex. 2004)(accident reconstruction cases)). That is, "we determine whether there are any significant analytical gaps in the expert's opinion that undermine its reliability" and where the gap between the data and the proffered opinion is simply too great, the expert opinion is unreliable. *TXI Transp. Co*, 306 S.W.3d at 235, 239 (citations omitted).

An expert's testimony that is not grounded in scientific methods and procedures and is instead based upon subjective belief or unsupported speculation is also unreliable. *TXI Transp. Co.*, 306 S.W.3d at 239 (citations omitted). The trial court's ultimate task is to determine whether the analysis the expert used to reach his or her conclusions is reliable, and therefore admissible, but it is not the court's task to determine whether the expert's conclusions are correct. *See Zwahr*, 88 S.W.3d at 629.

The trial court makes the initial determination about whether the expert and the proffered testimony meet these requirements. *Robinson,* 923 S.W.2d at 556. Because a trial court has broad discretion to determine admissibility, we will reverse only if there is an abuse of that discretion. *Robinson,* 923 S.W.2d at 558. A court abuses its discretion if it acts without

reference to guiding rules and principles. *Id*.

*Analysis*

In support of its contentions that "Neither witness can satisfy the reliability factors," and that "their [analyses evidence is] only the type of 'analytic gap' against which the [Supreme] Court cautions," Great American asserts that "[b]oth admitted they had no scientific basis for their linear model . . . [and neither] cited any tests that confirmed their rate of decay, nor [conducted] any tests on similar products, in similar circumstances, to substantiate their opinions." Among other complaints, Great American also complains that none of the experts' work is published and concludes that the articles cited by Yeandle and Nicholas in support of their conclusions are "largely inapposite and anecdotal, at best," and that the experts do not discuss the rate of decay. Great American argues that Yeandle "offers no methodology beyond a general observation of a temperature range favorable to mold growth, and does not explain how he accounted for temperatures outside that range."

We disagree with Great American's assertions that the foundational data and the methodology are unreliable. It is evident from the testimony and the articles upon which the experts relied that certain variables are involved in the commencement and progression of wood rot. Here, the evidence regarding the relevant weather data from the National Weather Service regarding temperatures and rainfall during the years after the Hamels' home was constructed was considered by the court. The trial court also heard evidence regarding the constancy of other factors such as density of wood members, the commonality of brown rot, the construction defects of the roof permitting water intrusion, the completion date of the home in late 1995, the first observations of water intrusion, the first examinations and probing of wood members, the extent of

43

rot discovered, and scientific articles which supported the experts' methodology, opinions, and conclusions, particularly regarding loss of mass and strength in a wood member subject to wood rot over time.

In light of this and other evidence, we conclude the foundational data and methodology underlying the experts' opinions and conclusions are reliable, and determine that no significant analytical gaps exist in the experts' opinions to undermine their reliability. *TXI Transp. Co*, 306 S.W.3d at 235, 239 (citations omitted).

Because the trial court did not abuse its discretion in determining that Yeandle and Nicholas were qualified as experts or in admitting their testimony, we overrule Issue Two.

## ISSUES THREE AND FOUR

We consider Issues Three and Four together and first address Issue Four in which Great American contends the trial court erred in awarding the Hamels recovery of the underlying judgment because Hamel did not prove covered damage during a Great American policy period. Great American alternatively argues that the trial court erred in awarding recovery of the underlying judgment because Hamel did not allocate damage among its policies and did not segregate covered damage from non-covered damage, and because the evidence showed that most of the damage took place during policy periods when an exclusion applied or after Great American was no longer "on the risk." It asserts the policies containing the EIFS exclusion provide no coverage for property damage arising out of TMB's work with regard to any exterior component, fixture, or feature of a building if EIFS is used anywhere on the structure, and that it is undisputed that EIFS was used on the Hamels' house and that the "nature of the exterior problems giving rise to the damage" are also undisputed.

44

The trial court found the Hamels are not required to allocate losses suffered among the insurance policy periods. The trial court also found that sufficient wood rot damage of at least 10 percent wood mass loss, resulting in a greater than 50 percent reduction in strength, had occurred during the first policy period to require replacement during the first policy period, and although additional wood rot may have occurred after the first policy period expired, any additional wood rot damage occurring thereafter would not have increased the Hamels' repair costs. Because it found and concluded that all of the repair damages awarded in the construction judgment were related to wood rot that occurred during the first policy period, the trial court determined that the Hamels are entitled to collect under the first policy the full amount owed under the construction judgment. The trial court alternatively found that such damage occurred before the end of the third policy period.

Despite Great American's assertions to the contrary, sufficient evidence supports the trial court's findings that the Hamels' injury-in-fact was shown to have occurred in the first policy period and, in no event, later that the third policy period. The EIFS exclusion was only present in policies issued after the third policy period. Therefore, the EIFS exclusion was not applicable to the Hamels' case.

Moreover, as to Great American's allocation complaints, the Texas Supreme Court has observed:

> If a single occurrence triggers more than one policy, covering different policy periods, then different limits may have applied at different times. In such a case, the insured's indemnity limit should be whatever limit applied at the single point in time during the coverage periods of the triggered policies when the insured's limit was highest. The insured is generally in the best position to identify the policy or policies that would maximize coverage. Once the applicable limit is identified, all *insurers* whose policies are triggered must allocate funding of the indemnity limit among themselves according to their subrogation rights.

*Am. Physicians Ins. Exch. v. Garcia,* 876 S.W.2d 842, 855 (Tex. 1994)(emphasis added). Neither the policies nor Texas law provides for *pro rata* or any other form of allocation between the policies.

In Issue Three, Great American contends the trial court, in its September 10, 2007, ruling on the parties' cross-motions for summary judgment, adopted an erroneous interpretation of the EIFS exclusion in the policies effective May 3, 1999, to May 3, 2001, when it held that the EIFS exclusion contained within its later policies modified the definition of "your work" and created coverage for TMB's subcontractors' work.[10] Great American disagrees with the trial court's subsequent order of November 15, 2010, denying its motion for consideration in which the trial court observed:

> Since signing the [order of September 10, 2007,] the case has been tried to the bench and it has been found that the injury/damages occurred during a policy year in which there was no EIFS exclusion. Because of this finding, the final judgment in this case will not be based on a policy containing an EIFS exclusion and this court's construction of the EIFS exclusion. . . . Because of developments subsequent to the order of September 10, 2007, it would appear that the application of the EFIS [sic] exclusion and Prompt Payment Act to the case are moot.

Great American argues that the trial court's September 2007 interpretation is not moot, is erroneous, and impacts the complaints it presents in Issue Four.

Because no EIFS exclusion applied in this case, the trial court's allegedly erroneous interpretation of that provision in its order of September 10, 2007, is of no consequence and as the trial court correctly noted, Great American's complaints regarding the court's interpretation of any EIFS exclusion are moot. Issues Three and Four are overruled.

---

[10] Great American informs us, "The EIFS exclusion is found in many places in the record[,]" and directs us to a portion of the clerk's record which does not include the EIFS exclusion or any policies and consists only of unrelated testimony.

**ISSUE FIVE**

In their Fourth Amended Petition in the construction case, the Hamels sought to recover actual and other damages including "[m]ental anguish suffered by the Plaintiffs as a result of TMB's conduct[.]" During trial of the coverage case, Mr. Hamel explained that although their home was intended to be the one that he and his wife would spend the rest of their lives in, they "want[ed] out" because the problems with the house had been tremendously stressful for them. He described at trial how the "last few years [had] just been an absolute nightmare," and that Mrs. Hamel did not want to return to the home at night. He stated that this had caused a great deal of stress and emotional heartache for him, but more so for Mrs. Hamel, and declared that he thought his wife "wouldn't give any amount of money to stay there, but $50,000" for "the whole time period." The trial court found the Hamels had suffered mental anguish and distress as a result of the defects and water damage to their home, and awarded the Hamels $50,000 in mental anguish damages.

In Issue Five, Great American challenges the trial court's award of mental anguish damages in the judgment because it was not covered under the policies. Great American relies on *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 820, 823 (Tex. 1997), in support of its assertion that because the Hamels presented no evidence of any physical manifestations of their mental anguish the amounts awarded for mental anguish do not constitute "damages because of 'bodily injury'" as set forth in the policies. In *Cowan*, the Texas Supreme Court considered whether mental anguish alone is a "bodily injury" under a standard homeowners' insurance policy defining "bodily injury" as "bodily harm, sickness or disease." *Cowan*, 945 S.W.2d at 822. The relevant policy language in that case, located under Coverage C (Personal Liability) provided in

part, "If a claim is made or suit is brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, [Trinity] will . . . pay up to our limit for the damages for which the insured is legally liable . . . [and] provide a defense at [Trinity's] expense by counsel of [Trinity's] choice even if the suit is groundless, false or fraudulent." *Cowan*, 945 S.W.2d at 822. The Court concluded that absent an allegation of physical manifestation of mental anguish, a claim of mental anguish is not a "bodily injury" as defined in the homeowner's policy for purposes of invoking the duty to defend. *Cowan*, 945 S.W.2d at 820. The Court specifically held that "bodily injury," as defined in the policy at issue, did not include purely emotional injuries as alleged by Cowan, and that the term unambiguously required an injury to the physical structure of the human body rather than "purely mental, emotional, or spiritual harm." *Cowan*, 945 S.W.2d at 823.

The policies before us differ from the policy in *Cowan*. Each of Great American's policies provide under the insuring agreement in Section I (Coverages), Coverage A (Bodily Injury and Property Damage Liability) that it "will pay those sums that the Insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The Great American policies define "bodily injury" to mean "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time," and "property damage" to mean "physical injury to tangible property, including all resulting loss of use of that property [and] . . . loss of use of tangible property that is not physically injured." Great American's policies do not expressly address coverage for mental anguish in relation to damage due to bodily injury or property damage.

The Hamels counter that they are entitled to recover mental anguish damages not because

48

of bodily injury, which forms the basis of Great American's complaint in Issue Five, but rather because those damages were, in the language of the policy, "damages because of" property damage as provided in Coverage A of each policies' insuring agreement. The Hamels never sought to obtain mental anguish damages because of bodily injury. The Hamels urge that their mental anguish damages are consequential damages arising out of the property damage, and argue that once covered property damage exists, all consequential damages are covered, including mental anguish damages. They contend that upon the triggering of the policy, these consequential damages are covered even though they do not constitute "property damage" or "bodily injury."

In support of their contentions, the Hamels direct us to the Texas Supreme Court's decision in *Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 809, 812-14 (Tex. 2006). In that case, Brainard was killed in a collision with a rig owned by a well service, and the policy dispute involved whether the underinsured motorist policy issued by Trinity to Brainard's family business covered the prejudgment interest that the insured would owe on the actual damages awarded. *Brainard*, 216 S.W.3d at 812. Trinity argued that its underinsured motorist policy required that it pay only those damages which Brainard was legally entitled to recover "because of bodily injury or property damage," and posited that the "because of" language in the policy constituted a qualification negating coverage for prejudgment interest, the purpose of which serves as compensation for lost money and not damages from bodily injury. *Brainard*, 216 S.W.3d at 812-14.

Noting that prejudgment interest is awarded to fully compensate an injured party, not to punish the defendant, the Court recognized that it had "consistently viewed prejudgment interest

49

as falling within the common law meaning of damages[.]" *Id*. at 812. The Court observed that courts of appeals which had determined that underinsured policies do not cover punitive damages, had not done so "by adopting Trinity's narrow interpretation of damages 'because of bodily injury,'" and noted that the reasoning in those cases instead effectively supported coverage for prejudgment interest. *Brainard*, 216 S.W.3d at 813. Addressing the applicability of certain statutory provisions, the Court held the underinsured motorist policy controlled Trinity's obligations, covered the prejudgment interest, and because Brainard had obtained a judgment establishing the insured's underinsured status, determined that Trinity was required to pay benefits under the terms of the policy. *Brainard*, 216 S.W.3d at 815.

The Hamels also direct us to persuasive federal authority. In *National Union Fire Ins. Co. v. Puget Plastics Corp.*, the United States District Court for the Fifth Circuit determined that indemnity could be sought for consequential damages resulting from covered property damage when the policy contained the "because of property damage" clause. *See National Union Fire Ins. Co. v. Puget Plastics Corp.*, 532 F.3d 398, 403 (5th Cir. 2008)(seeking indemnity for consequential damages in the form of lost profits and diminution in value that resulted from damage to water heaters); *see also Hartford Cas. Co. v. Cruse,* 938 F.2d 601, 605 (5th Cir. 1991)(homeowners could recover mental anguish damages derived from a covered occurrence of property damage involving defective foundation-leveling services on a home).

We find guidance in a case on which neither party relies. In *City of Tyler v. Likes*, 962 S.W.2d 489, 492, 497 (Tex. 1997), in which suit was brought under the Texas Tort Claims Act, common law, and the Texas Constitution, the Texas Supreme Court held that "mental anguish based solely on negligent property damage is not compensable as a matter of law." *Likes*, 962

S.W.2d at 492, 497. There the Supreme Court specifically determined that "[b]ecause the injury to Likes's property was not intentional or malicious, or even grossly negligent, we need not decide whether mental anguish arising out of property damage may be legally compensable when a heightened degree of misconduct is found." *Id.* at 497.

In the Hamels' construction case, the trial court found that TMB did not intentionally cause damage to the Hamels' residence, but that such damage was caused as a result of TMB's negligence. The trial court concluded as a matter of law that TMB breached its duties owed to the Hamels and was negligent, and that such negligence was the producing and proximate cause of the Hamels' damages. In awarding the Hamels $50,000 for mental anguish and distress, the trial court made no findings of fact regarding a heightened degree of misconduct.[11] *See Likes*, 962 S.W.2d at 497.

The coverage-case trial court concluded that Great American is bound by the construction-case judgment. However, under the jurisprudence of *Likes,* because the property damage was caused by TMB's negligence rather than its intentional, malicious, or grossly negligent conduct, we conclude the Hamels' mental anguish is not a compensable damage as a matter of law. *Likes*, 962 S.W.2d at 497. Issue Five is sustained.

## CONCLUSION

Having sustained Issue Five, the "covered damages" awarded in the coverage-case judgment is modified and reduced in the amount of $50,000, which sum was awarded as damages for mental anguish and distress in the construction-case judgment. As modified, the

---

[11] The trial court in the coverage case found that the damages awarded to the Hamels in the construction-case judgment were "caused by property damage caused by an occurrence" as that term is used in the policies. It concluded that Great American was obligated to pay that judgment and owes the Hamels, pursuant to the first policy, "[c]overed damages" in the construction judgment.

51

coverage-case judgment is affirmed.

YVONNE T. RODRIGUEZ, Justice

September 19, 2014

Before McClure, C.J., Rivera, and Rodriguez, JJ.
Rivera, J., not participating