# Supreme Court of Texas

No. 24-0525

S&B Engineers & Constructors, Ltd. and
Zurich American Insurance Company,

*Petitioners*,

v.

Scallon Controls, Inc.,

*Respondent*

On Petition for Review from the
Court of Appeals for the Ninth District of Texas

JUSTICE BLAND, joined by Justice Lehrmann, Justice Devine, and Justice Huddle, dissenting.

We long have held that indemnity agreements requiring A to indemnify B for B's own negligence must do so in express terms.[1] We also have long held that a settling party resolves only its share of liability in a case involving joint tortfeasors.[2]

---

[1] *See Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex. 1987).

[2] *See Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19, 21–22 (Tex. 1987).

This case is no more complicated than the plain language in two agreements. The first is a proportionate indemnity clause, in which a seller agreed to indemnify a buyer for the seller's "allocable" negligence. The second is a settlement agreement between the buyer and injured individuals that releases the buyer but not the seller. The question is whether the word "allocable" transforms the payment the buyer made to settle its own negligence into the seller's negligence. It does not.

Striving mightily to reach the opposite conclusion, the Court trumpets the freedom of contract while eschewing this contract's plain text, careening through precedential guardrails erected forty years ago. Worse, the Court creates a new species of trial, supposing its case-within-a-case chimera will be more "streamlined" than the ordinary personal injury negligence cases trial courts have managed for years. In truth, manipulated party positions result in burdensome and unfair trials, a lesson our Court learned at great cost during the 1980s and 1990s but now has forgotten.

A proportionate indemnity clause is generally enforceable. But a proportionate indemnity clause that does not grant a right to settle one's own negligence and pursue the indemnitor for that amount violates the rule requiring express language before shifting liability for B's own negligence to A.

The trial court in this case properly granted summary judgment. The court of appeals properly affirmed, holding that the agreement at issue does not indemnify the buyer for the buyer's settlement of the buyer's own negligence. As the Court reaches the opposite conclusion, I respectfully dissent.

**I**

Scallon Controls, Inc. supplied a fire suppression system to S&B Engineers & Constructors, Ltd. for installation at a refinery owned by Sunoco Logistics Partners, L.P. The purchase order includes two indemnity provisions. For claims by Scallon's employees, agents, or subcontractors, "[i]t is the express intent of the parties herein that [Scallon] save harmless and indemnify S&B, and its affiliated companies, subsidiaries and clients from S&B's . . . concurrent, contributory or sole negligence." Thus, Scallon agreed to indemnify S&B for S&B's own negligence if a Scallon employee sued S&B.

For all "other claims," however, Scallon indemnified S&B and its clients only for "any and all loss . . . arising out of . . . bodily injury, disease or death to persons other than employees of [Scallon] . . . resulting from or in connection with the execution of this purchase order to the extent of [Scallon's] negligence or willful misconduct." In the event of "comparative, concurrent, and/or contributing negligence," Scallon thus agreed to proportionately indemnify S&B for *Scallon's* "allocable share" of negligence, not for S&B's negligence, when someone other than a Scallon employee sued S&B.

In 2015, a power loss triggered the fire suppression system at the Sunoco refinery, releasing a chemical called Purple K. Employees of a Sunoco subcontractor working atop scaffolding fled and allegedly fell and suffered injuries. Seven individuals—none Scallon employees—sued Sunoco and S&B for negligence. The plaintiffs did not sue Scallon or allege that Scallon was concurrently negligent with S&B. Nor did

S&B timely designate Scallon as a potential responsible third party. S&B further did not timely disclose in discovery that Scallon's negligence contributed to the plaintiffs' injuries.[3]

Two years after the individual plaintiffs sued, S&B belatedly attempted to add Scallon as a responsible third party, alleging that Scallon had configured the fire suppression system incorrectly. The individual plaintiffs successfully objected to this untimely pleading because S&B had not disclosed Scallon's existence until after the plaintiffs' statute of limitations had run. S&B then sued Scallon as a contribution defendant under Texas Civil Practice and Remedies Code section 33.016. Contrary to the Court's assertion that S&B "den[ies] any negligence,"[4] S&B concedes it had "certain liability" to the plaintiffs.

Shortly thereafter, S&B settled the plaintiffs' personal injury claims against it. The settlements, totaling $6.75 million, deny any liability. The plaintiffs released S&B and Sunoco, and S&B and Sunoco mutually released each other from any and all claims.[5] Scallon did not participate in the settlement, and the settlement did not secure a release from the individual plaintiffs as to any claims against Scallon.

After the settlement, S&B and Sunoco sought to realign the case, casting themselves as the plaintiffs and Scallon as the defendant. As

---

[3] The references to S&B in this opinion include Sunoco or its insurer where relevant. Sunoco asserted similar claims and has since nonsuited its claims against Scallon. Sunoco's insurer intervened and joined S&B's arguments.

[4] *See ante* at 11.

[5] S&B directly contributed $2.35 million to the settlement; the rest came from insurers of S&B and Sunoco.

plaintiffs, S&B and Sunoco sought contribution from Scallon for "damages"—the money they paid to settle with the individual plaintiffs, plus attorney's fees and expenses associated with defending and settling the case against them.

S&B and Scallon filed cross-motions for summary judgment. S&B sought indemnification. Scallon invoked the express negligence rule, contending that the parties' indemnity provisions did not afford a recovery because the settlement payment related to S&B's negligence and Scallon had indemnified S&B only for damages resulting from Scallon's negligence, not S&B's own negligence. The trial court rendered judgment in favor of Scallon.

The court of appeals affirmed.[6] Relying on this Court's established precedent, the court of appeals agreed with Scallon that under the express negligence rule, "parties seeking to indemnify the indemnitee from the consequences of its own negligence must express that intent in specific terms [] within the four corners of the contract."[7] The agreement between Scallon and S&B for claims brought by third parties does not indemnify S&B for its own negligence.[8] Because the individual plaintiffs sued S&B for S&B's own negligence and made no claim against Scallon, the court held that the express negligence rule barred S&B's claim for indemnity against Scallon.[9]

---

[6] 716 S.W.3d 590, 612 (Tex. App.—Beaumont 2024).

[7] *Id.* at 609 (alteration in original) (quoting *Ethyl*, 725 S.W.2d at 708).

[8] *Id.* at 610.

[9] *Id.* at 610–11.

5

## II

Under the Court's longstanding precedent, a party may settle only its own proportionate share of liability.[10] Defendants responsible for a plaintiff's injuries may not "in effect, buy the plaintiff's claims and prosecute the other jointly responsible parties" because, as the Court foresaw in *Beech Aircraft Corp. v. Jinkins*, "the settling defendant's unusual posture as surrogate plaintiff, co-defendant, and cross-plaintiff will confuse a jury and possibly prejudice the remaining parties."[11] This rule, in place since 1987, limits the assignability of claims beyond the settling tortfeasor.[12] The question presented to the Court in this case is whether the proportionate indemnity clause in the purchase order permits S&B to pursue Scallon for S&B's settlement of the claims made against S&B, not Scallon. It does not.

## A

Understanding an indemnity agreement begins with its text. After a long history of drafters seeking to impose total indemnity by sleight of pen, this Court adopted the express negligence rule in *Ethyl Corp. v. Daniel Construction Co.*[13] Decrying the "plethora of law suits to construe" indemnification agreements drafted to be "just ambiguous enough to conceal" their true liability-shifting purpose, we refused to

---

[10] *Jinkins*, 739 S.W.2d at 21–22.

[11] *Id.* at 22.

[12] *Id.*; *Int'l Proteins Corp. v. Ralston–Purina Co.*, 744 S.W.2d 932, 934 (Tex. 1988).

[13] 725 S.W.2d at 707–08.

6

finely parse future indemnity agreements.[14] Instead, "parties seeking to indemnify the indemnitee from the consequences of its own negligence must express that intent in specific terms . . . . within the four corners of the contract."[15]

The parties' post-*Ethyl* purchase agreement in this case precisely demonstrates compliance with the express negligence rule. The first paragraph of the indemnity clause does so: "It is the express intent of the parties herein that [Scallon] save harmless and indemnify S&B, and its affiliated companies, subsidiaries and clients from S&B's . . . concurrent, contributory or sole negligence." Of course, this part of the indemnity provision covers only those claims brought by Scallon employees against S&B.

The indemnity provision covering claims made by anyone else— such as the individual plaintiffs injured in this case—lacks any expression indemnifying S&B for S&B's own negligence. For all claims other than those brought by Scallon employees, Scallon has no duty to indemnify S&B for S&B's own negligence. The first sentence instead binds Scallon to indemnify S&B only for losses resulting from *Scallon's* negligence:

> To the maximum extent permitted by applicable law, [Scallon] shall defend, indemnify and hold harmless S&B and its affiliated companies, subsidiaries and clients from and against any and all loss, damage, claim, suit, liability, strict liability, product liability, judgment and expense (including attorney's fees and other costs of litigation) and any fines, penalties and assessments, arising out of

---

[14] *Id.*

[15] *Id.* at 708.

> (A) damage to or loss of property or (B) bodily injury, disease or death to persons other than employees of [Scallon], its agents or subcontractors resulting from or in connection with the execution of this purchase order to the extent of [Scallon's] negligence or willful misconduct.

If S&B is concurrently negligent, the second sentence limits Scallon's duty to indemnify S&B only to the loss "allocable" to *Scallon*:

> In case of comparative, concurrent and/or contributing negligence, fault or strict liability of [Scallon] or [S&B], whether through its employees and/or representatives, [Scallon's] duty to indemnify and hold harmless referred to in the previous sentence shall be [Scallon's] allocable share of comparative, concurrent and/or contributing negligence, fault or strict liability.

Nowhere does Scallon grant S&B the right to settle claims made against Scallon on Scallon's behalf.

S&B cannot claim that the indemnity agreement granted S&B authority to settle claims against Scallon—claims the plaintiffs *never asserted*. Nor did S&B's settlement agreement with the individual plaintiffs purport to settle claims against Scallon. Instead, the settlement resolves only claims against S&B and Sunoco.

S&B's settlement of its own liability is not "loss . . . arising out of . . . bodily injury . . . in connection with the execution of this purchase order to the extent of [*Scallon's*] negligence or willful misconduct," for which Scallon agreed to indemnify S&B. By its plain terms, the underlying settlement releases S&B and Sunoco for their own liability. Scallon is not mentioned in it. Even without the *Jinkins* rule that a party may settle only its own negligence, *this* settlement is purely a payment to settle S&B's own negligence. S&B argues that it is entitled to a trial on what percentage of its settlement is "allocable" to Scallon's

8

negligence, but the answer as a matter of law is zero. Every dollar S&B paid was to settle S&B's negligence, not Scallon's.

There is no substantive difference between a settlement by S&B of the plaintiffs' putative claims against Scallon—not permitted anywhere in the purchase order—and implying that S&B settled Scallon's "allocable share" of the plaintiffs' claims against S&B. Such a reading operates as an assignment of the injured plaintiffs' claims against Scallon to S&B—claims those plaintiffs never asserted and for which limitations has run. The indemnity in the parties' purchase order cannot be so stretched purely by implication.

**B**

Tellingly, the Court does not begin with the text of the indemnity agreement.

Instead, the Court begins with what it views as the primary impediment to endorsing its settle-and-sue scheme: *Jinkins*. The Court faults *Jinkins* for not addressing or mentioning contractual indemnity. In the Court's telling, nothing in *Jinkins* "suggest[s] that *parties* could not create rights to indemnification if they deemed it in their interest to do so," emphasizing that the parties "bargained for and agreed to" indemnity.[16] *Jinkins* therefore "plays no role."[17]

*Jinkins* is not irrelevant: it is the background rule against which these parties contracted. We must examine the contract language to understand whether the parties "bargained for and agreed to" a

---

[16] *Ante* at 7.

[17] *Ante* at 9.

9

contribution scheme other than that provided at common law and by statute. The contract, of course, is silent, other than the word "allocable."

"Allocable" means that the loss is capable of being apportioned.[18] It does not mean that the parties endorsed any and all methods of allocation—allocation according to augury or chance surely is excluded. Instead, in the absence of terms to the contrary, we can infer that "allocable" refers to the existing proportionate liability scheme in Civil Practice and Remedies Code Chapter 33.[19] The Court is quick to point out that Chapter 33 "expressly disclaims any desire to supersede contractual rights."[20] But where the parties have not contracted for a particular scheme of allocation, no contractual right is superseded by the statute.

S&B argues that the indemnity provision did not need to "spell out" a right to settle a joint tortfeasor's claims because under *Fireman's Fund Insurance Co. v. Commercial Standard Insurance Co.*,[21] an

---

[18] *See Allocable*, American Heritage Dictionary (5th ed. 2022) ("Capable of being allocated"); *Allocate*, American Heritage Dictionary (5th ed. 2022) ("2. To distribute according to a plan; allot"); *Allocate*, Black's Law Dictionary (12th ed. 2024) ("1. To distribute, allot, or apportion; to place a share or shares by designation or specification.").

[19] *See* Tex. Civ. Prac. & Rem. Code §§ 33.001–.017.

[20] *Ante* at 8. *See* Tex. Civ. Prac. & Rem. Code § 33.017 ("Nothing in this chapter shall be construed to affect any rights of indemnity granted by any statute, by contract, or by common law. To the extent of any conflict between this chapter and any right to indemnification granted by statute, contract, or common law, those rights of indemnification shall prevail over the provisions of this chapter.").

[21] 490 S.W.2d 818 (Tex. 1972).

indemnitee may settle and sue its indemnitor.[22] This ignores a crucial distinction: in *Fireman's Fund* the indemnitee had the indemnitor's *consent* to settle.[23] Moreover, in the insurance context, the insurer indemnifies the insured for the insured's own negligence, not commingled negligence left to be untangled by a factfinder.[24] Absent the parties' express agreement to do so, our Court should not import procedures that minimize litigation and hasten resolution in the insurance context when they have the opposite effect in the proportionate liability context. The Court agrees that Scallon is not an *insurer* of S&B's negligence. That is, however, the result of its decision to permit S&B to "allocate" its settlement of the claims against it to Scallon.

---

[22] *Id.* at 824.

[23] *Id.*; *see also In re Farmers Tex. Cnty. Mut. Ins. Co.*, 621 S.W.3d 261, 271 (Tex. 2021) (permitting settlement to trigger indemnification where insurer participated in the settlement).

[24] *See In re Ill. Nat'l Ins. Co.*, 685 S.W.3d 826, 838–40 (Tex. 2024) (insurer's duty to indemnify may be triggered by insured's settlement with third parties where policy terms require insurer to "pay on behalf of" the insured "regardless of whether [the insured] ever actually pays out of its own coffers first"). The same is true of the other total indemnification cases cited by the Court. *See Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794 (Tex. 1992); *Gulf, Colo. & Santa Fe Ry. Co v. McBride*, 322 S.W.2d 492 (Tex. 1958). The rule of these cases is that an indemnitor that refuses to defend a suit upon presentment by the indemnitee waives its right to insist upon a judicial determination of liability. *Gulf*, 322 S.W.2d at 495. The indemnitee may settle with the plaintiff but must show that the settlement was made in good faith for a reasonable and prudent amount. *Id.* at 496. What can be done as a matter of law in a total indemnification case becomes a knotty question of fact in proportionate indemnification.

S&B further argues that if it can prove Scallon's negligence contributed to the plaintiffs' injuries, then some of the settlement payment must be "allocable" to Scallon's negligence. There is no judgment, however, that the plaintiffs were made whole. The money paid represents the settlement value to the plaintiffs, S&B, Sunoco, and their insurers for claims among those entities and nothing else. It may be informed by the plaintiffs' damages, but the amount bears no legal or mathematical relationship to the plaintiffs' actual damages—and certainly no judicial one. S&B's argument ignores our rule that a party settles claims only against itself by wrongly characterizing the settlement as also settling claims against Scallon—again, claims the plaintiffs *never brought*.[25]

S&B and others like it are sophisticated parties, capable of arranging their own allocation of risk.[26] It was S&B that (1) chose to forgo naming Scallon as contributorily negligent, and (2) elected not to enforce its bargained-for indemnity rights against Scallon. S&B could have designated Scallon as a responsible third party at the proper time, with the natural consequence of inducing Scallon to participate in settlement negotiations. If the case proceeded to trial, Scallon would be liable for its share of any joint and several liability the judgment imposed against it and S&B.

---

[25] *See Jinkins*, 739 S.W.2d at 21–22.

[26] *E.g.*, *Waste Mgmt. of Tex., Inc. v. Stevenson*, 622 S.W.3d 273, 286 (Tex. 2021) ("'Texas strongly favors parties' freedom of contract,' under which parties may 'bargain for mutually agreeable terms and allocate risks as they see fit.'" (quoting *Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007))).

Having failed to designate Scallon as a responsible third party, S&B nevertheless could have stood on its indemnity rights and proceeded to trial and judgment with the individual plaintiffs and Scallon as a contribution defendant. Instead, S&B elected to buy peace at the cost of nullifying its indemnity rights, rights that did not indemnify it for its own negligence. Its decision was a wholly rational move by a sophisticated party—a party that prearranged for indemnity for its own negligence in some cases (claims brought by Scallon employees) and not in others like the one here. We need not rescue S&B from its litigation strategy under the guise of contract interpretation.

The parties and amici tell us that the use of proportionate indemnity clauses is relatively new. But our jurisprudence is old—and clear. If a contract shifts the burden of B's own negligence to A, it must do so in express language. No settlement can convert B's negligence into A's negligence. The express negligence rule bars reading the proportionate indemnity provision in the parties' agreement to permit a post-settlement indemnity trial.

## C

Even if the express negligence rule did not apply, our skepticism of agreements that distort and prolong litigation favors rejecting S&B's novel approach. We do not allow parties to circumvent by contract that forbidden by law.[27] Far from being "streamlined," as the Court assures,

---

[27] *E.g.*, *Trevino v. Turcotte*, 564 S.W.2d 682, 690 (Tex. 1978) (holding that persons estopped from contesting a will may not overcome the estoppel by taking an assignment from others); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 684 (Tex. 1990) (holding unreasonable agreement not to compete

S&B's trial for post-settlement indemnity claims bears the hallmarks of skewed and prejudicial proceedings we have rejected.

The most notable example is our rejection of "Mary Carter" agreements in *Elbaor v. Smith*.[28] Like here, a Mary Carter agreement involves joint tortfeasors.[29] The plaintiff settles with one defendant in exchange for the defendant's cooperation against the non-settling defendant.[30] The patient in *Elbaor* settled with three providers for a fraction of her alleged damages.[31] The settling health care providers agreed to participate in the patient's trial against the non-settling providers and would obtain reimbursement of their settlement out of her eventual recovery.[32] Despite attempts to mitigate the harmful effects of this posture, "odd conflicts of interest" arose during the trial.[33] For example, the settling defendants' attorneys asserted that the patient's damages were "devastating, astoundingly high, and astronomical."[34]

---

unenforceable); *Hoover Slovacek LLP v. Walton,* 206 S.W.3d 557, 559 (Tex. 2006) (holding termination fee in contract for legal services unenforceable).

[28] 845 S.W.2d 240 (Tex. 1992).

[29] *See id.* at 247 ("A Mary Carter agreement exists, under our definition, when the plaintiff enters into a settlement agreement with one defendant and goes to trial against the remaining defendant(s).").

[30] *Id.*

[31] *See id.* at 242 (listing the settlement amounts, which represented about 20% of the total damages found by the jury).

[32] *Id.*

[33] *Id.* at 246.

[34] *Id.*

These attorneys elicited information favorable to the patient and abandoned their pleadings on contributory negligence.[35]

A Mary Carter agreement "creates a tremendous incentive for the settling defendant to ensure that the plaintiff succeeds in obtaining a sizable recovery, and thus motivates the defendant to assist greatly in the plaintiff's presentation of the case."[36] Although the agreements secure partial settlement, "they nevertheless nearly always ensure a trial against the non-settling defendant."[37]

After a period of experimentation with prophylactic measures—and expressing regret at having delayed so long—our Court determined that Mary Carter agreements are void as a matter of public policy.[38] We set forth the reasons in *Elbaor*:

> The agreements pressure the "settling" defendant to alter the character of the suit by contributing discovery material, peremptory challenges, trial tactics, supportive witness examination, and jury influence to the plaintiff's cause. These procedural advantages distort the case presented before a jury . . . .

> Mary Carter agreements not only allow plaintiffs to buy support for their case, they also motivate more culpable defendants to "make a 'good deal' [and thus] end up paying little or nothing in damages."[39]

---

[35] *Id.*

[36] *Id.* at 247.

[37] *Id.* at 248.

[38] *Id.* at 248–49.

[39] *Id.* at 249 (final alteration in original) (internal citations omitted).

With its lopsided trials and protracted litigation, such an agreement "is simply an unwise and champertous device that has failed to achieve its intended purpose."[40]

A few years later, the Court called on *Elbaor*'s reasoning to reject an assignment in *State Farm Fire & Casualty Co. v. Gandy*.[41] Gandy promised never to collect against the defendant on an agreed $6 million judgment she obtained in exchange for the defendant's rights under his homeowner's insurance policy.[42] Like in *Elbaor*, we observed that the agreement "confused and distorted" the parties' positions.[43] The settlement made evaluation of Gandy's claims challenging: "It is difficult enough to try to determine what [a plaintiff] would have recovered had he gone to trial against [the defendant]; the determination is even more difficult when [the defendant's] opposing position must be reconstructed and its merits assessed without [the defendant's] cooperation."[44] If the parties proceed to trial, the difficulties in evaluating the plaintiff's claim disappear, as the "value has been fairly determined."[45] We concluded that: "In no event, however, is a judgment for plaintiff against defendant, rendered without a fully adversarial trial, binding on

---

[40] *Id.*

[41] 925 S.W.2d 696 (Tex. 1996).

[42] *Id.* at 698.

[43] *Id.* at 713.

[44] *Id.*

[45] *Id.* at 714.

16

defendant's insurer or admissible as evidence of damages in an action against defendant's insurer by plaintiff as defendant's assignee."[46]

The settlement in *Gandy* differs from the one here in that S&B alleges the settlement is adversarial.[47] It is similar, however, in that the settlement payment operates as a de facto assignment to S&B of the individual plaintiffs' claims against Scallon for Scallon's "allocable share" of S&B's payment to the plaintiffs. *Gandy* forbids such an assignment "rendered without a fully adversarial trial" insofar as it purports to bind an indemnitor.[48] Yet the Court today permits such an arrangement.

Had S&B timely named Scallon as a responsible third party, Scallon and S&B would jointly share the incentive to attack evidence of the plaintiffs' damages and bring forth evidence of the plaintiffs' contributory negligence. In the Court's proposed post-settlement indemnity trial, S&B is incentivized to support a high valuation of the plaintiffs' damages and has zero incentive to support any suggestion the plaintiffs were negligent. To do so would minimize its claim and recovery

---

[46] *Id.*

[47] *See Great Am. Ins. Co. v. Hamel*, 525 S.W.3d 655, 666 (Tex. 2017) (defining an adversarial settlement as one in which the party "bore an actual risk of liability for the damages awarded or agreed upon, or had some other meaningful incentive to ensure that the judgment or settlement accurately reflects the plaintiff's damages and thus the [party's] covered liability loss").

[48] 925 S.W.2d at 714.

17

against Scallon. Endorsing blatant reversals in position to maximize financial gain undermines confidence in the justice system.[49]

The "loss" of the settlement funds bears no relationship to the individual plaintiffs' damages. Yet S&B advances this figure as the anchor that establishes damages in the post-settlement indemnity trial—a figure we held inadmissible in *Gandy*.[50] S&B argues that it will have to prove that its settlement of the claims against it was reasonable. But a settlement may be reasonable for many reasons and yet outsized compared to actual damages. S&B stripped Scallon of the opportunity to have the plaintiffs' damages allocable to Scallon's negligence measured in fact, by a neutral factfinder, in a judicial forum with properly aligned parties.

The post-settlement trial thus denudes the settlement agreement of its purpose. S&B did not buy peace; it merely substituted a difficult case against sympathetic individual plaintiffs for a more dispassionate case against a corporate co-defendant target. No judicial resources have been spared, no burden on witnesses or jurors alleviated.

This Court ended Mary Carter agreements in 1992, and perhaps few today clamoring for post-settlement indemnification trials have experience defending a client in corrupt circumstances. But the difficulties of that time are preserved in this Court's opinions. We ought not disregard those warnings out of confidence that sophisticated

---

[49] *Henry S. Miller Com. Co. v. Newsom, Terry & Newsom, LLP*, 709 S.W.3d 562, 565 (Tex. 2024).

[50] 925 S.W.2d at 714.

parties can "manage" an abstract and skewed case better than the jurists of an earlier generation.

Finally, we have some early warning that the case-within-a-case trials will be as convoluted as feared. The Court claims that its "streamlined" trials will replace "a far more complex trial, the focus of which would primarily be on the underlying facts and circumstances of the workers' personal injuries and the extent of their damages."[51] It is unclear whether a settlement can be found to be reasonable without an inspection of the "underlying facts and circumstances" of the personal injury case. In another case pending in this Court, *Blanchard Refining Co. v. Industrial Specialists, LLC*,[52] the indemnitor and indemnitee proceeded to such a jury trial. Far from being "streamlined," the trial involved thirty depositions, hundreds of admitted exhibits, and ran for seven days. While that case involves indemnity language different than here, it is some presage that the cakewalk trials the Court envisions are an illusion. In fact, "the result is worse than if the parties had not settled."[53]

The proportionate indemnification clause in this contract is ineffective to shift S&B's settlement of its own liability to Scallon, but it does not lack force. S&B could have ensured that Scallon was properly joined or pursued a judgment allocating responsibility to Scallon for the plaintiffs' injuries. The parties could have agreed to indemnification of their own negligence for all claims, not just those claims asserted by

---

[51] *Ante* at 12–13.

[52] No. 26-0118.

[53] *Gandy*, 925 S.W.2d at 714.

19

their employees. These parties freely chose not to, instead limiting indemnity to their own proportionate share of liability. In permitting a claim to shift S&B's settlement funds to Scallon, the Court rewrites the agreement of sophisticated partes and permits a subterfuge assignment to proceed to a wholly ephemeral trial.[54]

<p style="text-align:center">*   *   *</p>

The Court incorrectly imputes an agreement to claim losses attributable to one's own negligence into a proportionate indemnity agreement that fails to cover such losses. Because the Court fails to properly interpret the parties' indemnity agreement, I respectfully dissent.

<div style="margin-left:50%">
Jane N. Bland<br>
Justice
</div>

**OPINION FILED:** March 13, 2026

---

[54] I agree with the Court that Zurich's intervention was timely; however, as Sunoco's subrogee, Zurich's claims are barred for the same reasons S&B's claims are barred, and thus the denial of intervention is ultimately harmless error.